THE MAYOR AND CITY COUNCIL OF NASHVILLE v.
H. C. LINCK et al.

1. CONSTITUTIONAL LAW. *Sabbath day.* The Legislature may pass laws and confer upon municipal governments the right to pass ordinances to compel, by penal enactments, cessation from secular pursuits on the Sabbath day.

2. CORPORATIONS, MUNICIPAL. *Construction of charters.* If the power is specifically given by charter to a municipal corporation to pass ordinances upon any subject, the power so granted cannot be enlarged or changed by the general clause, but if the subject is omitted altogether in the specific powers, authority to pass ordinances upon such omitted subject may be conferred under the general clause.

Mayor, etc., of Nashville v. Linck.

3. SAME. *Same. Power to enforce observance of the Sabbath day.* Under the authority "to license, tax and *regulate* auctioneers, grocers, merchants, retailers, taverns, brokers, peddlers, livery stable keepers, retailers of liquors," etc., and the authority "to pass all ordinances necessary for health, *convenience* and safety of the citizens," etc., the municipal authority have the power to pass ordinances preventing the sale of whiskey or beer on the Sabbath day, or sale of confectionaries.

FROM DAVIDSON.

Appeal in error from the Circuit Court of Davidson county. FRANK T. REID, J.

J. C. BRADFORD and A. S. COLYAR for Nashville.

W. K. McALISTER, JR., JOHN RUHM and JOHN LAWRENCE for Linck and others.

COOKE, Sp. J., delivered the opinion of the court.

The same question is involved in each of the above stated causes, and they have been heard together.

By section 4 of an ordinance, passed by the Mayor and City Council of Nashville, it was provided that "no person or persons, firm or firms, corporation or corporations, engaged in business, selling or trafficking or trading in any products, materials or articles of merchandise or in manufacturing, shall be allowed to keep his, her or their place or places of business open upon the Sabbath day, nor to buy, sell, deal out, or give away any product, material or article of merchandise from their said place or places of business or elsewhere, except as hereinbefore provided in sections 2 and 3." The proviso to section 2 is "that retail vendors of fruit and dealers in newspapers and

periodicals may keep open their stands for the sale of fruits and newspapers and periodicals only from four until eight o'clock A. M.; and by section 8 of the same ordinance it was provided that it shall not be lawful for the keeper of any tavern, hotel, coffee-house or restaurant to sell, barter, or give away on the Sabbath day any ale, beer, porter, or other fermented, spirituous or vinous liquors, or suffer the same to be drunk upon, in or about his, her or their premises. Defendant, Linck, was a licensed saloon-keeper, and kept open his saloon, and sold a glass of liquor on Sunday. Seifred was also a licensed saloon-keeper, and kept open his place of business, and sold a glass of lager-beer on Sunday. Moore was a licensed tobacco and cigar dealer, and kept open his place of business, sold a cigar upon Sunday; and Pfister was a licensed dealer in toys, stationery and newspapers, and kept open his stand, and sold a newspaper on Sunday after 8 o'clock A. M. Each of them having sold said articles at his regular place of business. They were each arraigned for violating said ordinance, known as the Sunday law, before the city court, and fined. They appealed to the circuit court where they were again tried by the circuit judge without the intervention of a jury, who found the facts in each case, as above stated; but his Honor being of opinion that said ordinance was void for want of authority in the mayor and city council to pass it, so held, and discharged the defendants, and the mayor and city council have appealed to this court. The only question for determination is: Does the charter of the city of

Nashville confer upon the mayor and city council the power to pass the ordinance in question, including these provisions under which the defendants have been charged?

The question as to the power of the State to compel by penal enactments the observance of the Sabbath day so far as cessation from secular pursuits is concerned, and to punish its open violation, as well as the power of the Legislature to confer the same authority upon municipal corporations has not been seriously questioned by the very able and learned counsel who have argued the cases for the defense, and is too well settled in our jurisprudence to admit of question or to require discussion.

While this has been virtually conceded in argument, yet it is very earnestly contended that this power has not been granted to the municipal government under its present charter. By the act of the Legislature, approved March 26, 1883, ch. 30, the former charter of the city of Nashville was repealed. And by the act of the 27th of March, 1883, the present charter was granted. By the latter clause of the fourth section of the repealing act above cited, it was provided that all city ordinances in force in cities whose charters are hereby repealed, shall continue in force, and have the effect of laws in each of said cities respectively until repealed or amended by the succeeding city government.

By the first section of the ordinance in question of the 16th of December, 1883, all former ordinances existing before the passage of the new charter restrain-

ing and punishing violations of the Sabbath were repealed, and the new ordinance in question re-enacted in their stead; said former Sunday ordinances which existed at the time of the repeal of the old charter, and were continued in force by the Legislature, were equally, if not more stringent, than the present, and were passed under the identical same powers contained in the old charter as those of the new under which the ordinance in question was passed: See McAlister's Dig., pp. 14, 15 and 18.

It is not pretended that either the new charter (act of 1883, ch. 14), or the former charter existing before it, conferred in express terms authority upon the city government to regulate by ordinances the observance of the Sabbath, or to prevent its open desecration, but it is contended that this power is contained in the charter, if not in express terms, by fair and legitimate construction and necessary implication, and is claimed to exist in the following clauses, to wit: section 17, sub-section 7, which provides that the mayor and city council shall have powers by ordinance, "to make regulations to secure the general health of the inhabitants, and to prevent and remove nuisances"; by section 17, sub-section 10, "to license, tax and regulate auctioneers, grocers, merchants, retailers, taverns, brokers, coffee-houses, confectioneries, retailers of liquors, hawkers, peddlers, livery-stable keepers, and all other privileges taxable by the State;" and by sub-section 24 of section 17, "To pass all ordinances necessary for the health, convenience and safety of the citizens, and to carry out the full intent and meaning of this

act, and to accomplish the object of this incorporation."
In looking to these provisions of the charter to see
if the power to pass the ordinance in question is con-
ferred by them, or either of them, we are to be gov-
erned by the following rules of construction: "It is
a general and undisputed proposition of law," says
Judge Dillon, "that a municipal corporation possesses,
and can exercise, the following powers and no others:
First, those granted in *express words;* second, those
*necessarily or fairly implied* in, or *incident* to the pow-
ers expressly granted; third, those essential to the
declared objects and purposes of the corporation, not
simply convenient, but indispensable. Any fair, reas-
onable doubt concerning the existence of the power is
resolved by the courts against the corporation and the
power is denied. Of every municipal corporation the
charter or statute by which it is created is its organic
act. Neither the corporation nor its offices can do
any act or make any contract, or incur any liability
not authorized thereby. All acts beyond the scope of
the powers granted are void": 1 Dill. Mun. Cor., p.
173, and the numerous authorities cited by him in sup-
port of these propositions. According to Judge Cooley,
"The powers of these corporations are either express
or implied. The former are those which the legisla-
tive act under which they exist confers in express terms;
the latter are such as are necessary in order to carry
into effect those expressly granted, and which must
therefore be presumed to have been within the in-
tention of the legislative grant": Const. Lim. 235.
"The general disposition of courts in this country has

been to confine municipalities within the limits that a strict construction of the grants of powers in their charters will assign to them; thus applying substantially the same rule that is applied to charters of private corporations. The reasonable presumption is, that the State has granted in clear and unmistakable terms all it has designed to grant at all ": *Ib.* 235–6.

Turning to our own decisions, we find the question now under consideration has never been determined by this court. In the case of *Long* v. *Taxing District, etc.,* 7 Lea, 134, Judge Cooper delivering the opinion of the court, said: " A city council, it has been well said, is a miniature legislature, authorized to legislate for a locality, and their ordinances, within the power entrusted, have all the force of laws passed by the Legislature. But there is a broad distinction between the general power to make laws and the special power of a municipal corporation to enact by-laws. * * * The power to make by-laws does not include the power to legislate on general subjects." Again he says: " The difficulty is in applying these principles (of construction) to the facts of particular cases. The limit of municipal authority has never been so clearly and accurately defined as to enable the court to say readily when it has been overstepped." In this case it was also said: " If the only power given to pass ordinances be by a general provision, the provision would be liberally construed. But if the general grant is given in connection with or at the end of a long list of specific powers the power conferred by the general clause would be restricted

by reference to the other provisions of the act: Citing 31 Ala., 76, and 11 Iowa, 399.

Testing the question by the foregoing principles, we think it is plain that the power to pass the ordinance in question is not conferred by sub-section 7 of section 17 of said act "to make regulations to secure the general health of the inhabitants, and to prevent and remove nuisances." It would be a strained and far-fetched construction to hold that violations of the Sabbath *per se* would affect the health of the citizens or constitute a nuisance. In the case of *Raleigh* v. *Daugherty*, 3 Hum., 11, it was held by this court that a charter giving power and authority to pass laws and ordinances necessary and proper to preserve the *health* and *comfort* of a town does not authorize the passing of an ordinance to suppress breaches of the peace. It was insisted in that case that the power existed under the provisions, because, as was said, breaches of the peace disturb the *comfort* of the citizens; but says Judge Green, "we think this would be a strained construction of the charter. The power to pass laws for the preservation of the health and comfort of the town is limited to such ordinances as relate to these *two* subjects."

Then is the power conferred by sub-sections 10 and 24 of section 17 of said act? Sub-section 10, as we have said, confers the power by ordinance to license, tax and *regulate* auctioneers, grocers, merchants, retailers, taverns, brokers, coffee-houses, peddlers, confectioneries, retailers of liquors, hawkers, etc., and all other privileges taxable by the State; and sub-section

28, "to pass all ordinances necessary for the health, *convenience* and safety of the citizens, and to carry out the full intent and meaning of this act, and to accomplish the object of this incorporation."

It will be observed that each of the defendants was a licensed dealer in the articles which they sold at their respective places of business upon Sunday, and the power is expressly given by sub-section 10 to the mayor and city council to *regulate* by ordinance the privilege of dealing in these articles. Under the authority to license and regulate, says Judge Cooley, "a municipal corporation may by ordinance require a license to be first taken out, and charge a reasonable sum for issuing the same, and keeping the necessary record, but cannot, by virtue of this authority, without more, levy a *tax* upon the occupation itself; and under the power to *regulate, it may make proper police regulations as to the mode in which the employment shall be exercised*": 1 Dillon on Mun. Cor., sec. 292, p. 394.

Again. With regard to the power conferred by sub-section 24, to pass all ordinances necessary for the health, convenience and safety of the citizens, and to carry out the full intent and meaning of this act and to accomplish the object of this incorporation. There is contained in the act of incorporation special authority to pass ordinances in regard to various other matters, but as we have seen, not in regard to the subject of *Sabbath-breaking*, and it is very earnestly insisted that these special powers as to other matters exclude the idea of any power to pass ordinances upon this subject under the general clause above cited.

The rule as we understand it is, if the power to pass ordinances upon any subject is specifically given, the power so granted cannot be enlarged or changed by the general clause, but if the subject is omitted altogether in the specific powers, authority to pass ordinances upon ·such omitted subject may be conferred under a general clause. In the case of Long against the Taxing District, above referred to, Judge Cooper said : " If the only power given to pass ordinances be by general provision, the general provision would be *liberally* construed. But if the general grant is given in connection with, or at the end of a long list of specific powers, the power · conferred by the general clause would be restricted by reference to the other provisions of the act." As we have already seen, there is no other provision in the act upon the subject in question by which the power under the general clause can be restricted. Judge Dillon lays down the rule as follows: " Where there are both special and general provisions, the power to pass by-laws under the special or express grant can only be exercised in the cases, and to the extent, as respects *those matters* allowed by the charter or incorporating act; and the power to pass by-laws under the general clause does not enlarge or annul the power conferred by the special provisions *in relation· to their various subject matters, but gives* authority· to pass by-laws reasonable in their character upon all other matters within the scope of their municipal authority, and not repugnant to the Constitution and general laws of the State ": 1 Dillon Mun. Cor., sec. 250. "And it

has been very properly held that a special grant of power to a municipal corporation to adopt ordinances on enumerated subjects connected with municipal concerns is in *addition* to the incidental power of the corporation ": *Ib.* " Municipal corporations are created and exist for the public advantage, and not for the benefit of their officers or of particular individuals or classes. The primary and fundamental idea of a municipal corporation is an agency to *regulate* and administer the internal concerns of a locality in matters peculiar. to the place incorporated," etc: *Ib.*, p. 93, sec. 9*b*. Possessing, then, the . power under the general provision to pass ordinances to carry out the full intent and meaning of its charter, and to accomplish the object of its incorporation, as well as such as were necessary for the health, *convenience* and safety of the citizens. And as the object of its incorporation was the proper regulation, good order and well-being of the community, and as a people whose traditions, laws and religion have accustomed them to the observance of the Christian Sabbath by a cessation from secular employments, and to consecrate it as a day of rest and devotion, it is not straining a construction to hold it would be a serious inconvenience, to say the least, trading houses and places of business are to be permitted to be kept open for the sale of wares and merchandise, and the transaction of secular business upon that day. We are therefore of the opinion that under the clauses contained in sub-sections 10 and 24 of section 17 of said charter, the mayor and city council have the power to regulate by ordinances.

these licensed tradesmen in carrying on their occupations by prohibiting them, as well as all others, from keeping their business houses open and selling their wares upon Sunday.

It is also insisted that the ordinance in question is in violation of the Constitution of the State, as there are other occupations not embraced by the ordinance in question. There is nothing in this position, as the ordinance embraces all the class to which they belong. In the case of *Lackey & Smith* v. *Knoxville*, 3 Head, 245, it was insisted that the ordinance of the city requiring all houses kept for the retail of spirituous liquors to be closed at 9 o'clock P. M., was class legislation, and in violation of the Constitution, because it placed a restriction upon one business that was not placed upon any other. Judge Caruthers, delivering the opinion of the court, said: "It must be left to the corporate authorities to determine what restrictions upon this trade are required for the general good; and unless they are unreasonable or oppressive they are valid, and will be maintained. The ordinance in question is neither unreasonable nor oppressive. And upon the whole case we are satisfied that it is a valid ordinance, and that the circuit court erred in discharging the defendants, and his judgment in each of the cases will be reversed, and the judgment of the city court affirmed with costs.

FREEMAN, J., delivered the following opinion:

I do not deem it improper to add a few considerations in addition to, and support of the conclusion

reached in the opinion of my brother, Cooke, in these cases:

I have no question that these cases turn on the proposition whether there is the power granted, and if so, has it been properly exercised. If clearly granted, and not in violation of the Constitutions, State and Federal, then I do not think courts have any thing to do but enforce the ordinances thus made by the governing body of a city or incorporated town. I know the rule has been stated differently somewhat in our own cases, and in many others, and by text-writers, such as, that an ordinance deemed unreasonable, or an ordinance is unreasonable, such as is contrary to the common law, is void. It is probable this came from the fact that in England these grants of charters were generally by the crown, and not by the legislative body: See 12 Law Library, 55, cited by Cooke in argument in 1 Hum., 235.

Where the power to pass an ordinance is clearly granted, unless in violation of the Constitution of the United States or our own, I know of no rule by which a court can, on the ground of unreasonableness, or any like cause, pronounce the ordinance void. It can no more do so than it can so pronounce the act of the Legislature void, which grants the power. It would be a paradox in judicial action to say the Legislature is authorized to grant the power, but this court could nullify its exercise for any such causes.

It has been said, I know, in 1 Hum., 240, that if a tax then complained of was unequal, and thus shown to be oppressive, the court would declare it

void; but I take it, this could only be on the ground that it had not been levied, as authorized by the Constitution, Art. 2, sec. 29, which requirement is: " The Legislature shall have power to authorize incorporated towns to impose taxes, &ast; &ast; for corporation purposes, &ast; in such manner as shall be prescribed by law, and all property shall be taxed according to its value," " upon the principles established in regard to State taxation," or in violation of the regulation as to privileges.

Passing from this—it is argued that Judge Cooper uses the language " regulate, but not restrain," in case of *Long* v. *The Taxing District*, 7 Lea, 136, and that these ordinances restrain. I take it the terms "regulate, but not *restrain* trade," perhaps do not express precisely the idea of the learned judge, that is the word *restrain* is used in the sense of prohibit or suppress. If this be its meaning, I would agree with it, as I am unable to see how there can be a regulation that is not a restraint. In fact, to regulate action, and leave it unrestrained, is a contradiction both in thought and fact; nothing can be regulated except by restraining its otherwise unrestrained activity. Regulate, as defined by lexicographers, is to adjust by rule or method, to direct, to rule, to govern, to methodize, to arrange. Every element of this definition involves restraint, the exercise of a power over a thing by which its activities are ruled or adjusted, or directed to certain ends. The word restrain is not strictly synonymous with regulate, having a more limited meaning, the essential element of which is " hold in or

back, curb, check." But the word regulate inevitably involves all that is meant by restrain, and more, as it carries with it the affirmative element somewhat of continued action in a defined direction. But this is restraint, so as to prevent other action than that desired.

So much for merely verbal criticism of the language employed in sub-section 10. But the true way of ascertaining its meaning is to take the language in its plain ordinary signification in view of the objects and purposes to be attained by the instrument in which it is found, and when this meaning is fairly made out, to enforce it. Neither a strict nor liberal, but a true construction is what should be the rule.

The language is to license, tax and regulate. To license is to give permission to follow the occupations referred to. To tax is to impose a charge for this privilege for revenue purposes, and to regulate means only to restrain within certain limits, such limits as shall be found conducive to the public interest and necessary to prevent the exercise of the privilege granted injuriously affecting others. This is about the sense in which the word is employed in an act conferring governmental powers on the agents of government established to rule a municipality. Such regulations must not violate the Constitutions, State or Federal—be in antagonism to statutes of the State regulating the same subject, and should be equal and uniform, at least on each class of privileges to be regulated—that is not discriminat-

ing in favor of or against any one of a class
for the benefit of another engaged in like business.
That the substantive power to regulate the particular
privileges referred to goes to the extent I have indi-
cated, I have no doubt. That it is a regulation
within the meaning of these words thus expounded,
to prohibit parties thus licensed from exercising their
privileges on Sunday, I think cannot be questioned.

Without discussing this question from any ecclesi-
astical or theologic standpoint, I think it manifest
that such a regulation is in accord not only with all
the traditions of our people, but also in accord with
a sound public policy.

Far back in the life and law of the people from
whom we derive our descent, whose usages and tra-
ditions have been handed down to us as our own,
we have everywhere, for a thousand years and more,
a recognition of the Christian Sunday as one of the
institutions as characteristic of our social organism as
is the marriage institution, and that to a single wife.
That the peculiar view of the sanctity of the day
characterizing the opinions of many have been car-
ried to extreme lengths, and embodied a spirit of
fanatical zeal for the day simply, may be conceded.
In this, such persons have forgotten, perhaps, or failed
to appreciate the view of the great founder of Chris-
tianity, when replying to religious formalist and zealots
of his time as to the true meaning of the Jewish
Sabbath—"that the Sabbath was made for man, not
man for the Sabbath."

Be this as it may, the day has been observed in

some form, and kept up among us and the people from whom we derive our institutions and law, as one of our institutions, for more than a thousand years. Its ordinary uses are well known, and these follow as implications, and become part of the institution itself, subject to such civil regulation and modification as may be deemed best conducive to promote the ends of a society in which such an institution exists, and is to be perpetuated.

The due regulation of such an institution, with such traditions and usages as have for so long accreted around it, would naturally be such as tended to aid the ends supposed to be desirable, and advanced by such observances as had grown up among us, or had been transmitted from other days to us.

We all know that by common and statute law the engaging in ordinary occupations has always been forbidden, if not absolutely, in a qualified degree. In other words, it is one of the usages of our country in connection with the Sabbath, that it shall be in theory, if not in fact, a day of rest from ordinary labor. Whatever regulation of the occupations and business life of our people either in country or city that falls in with these ideas can never be said to violate the public policy of this country. On the contrary, whenever we find a grant of power to regulate business of any kind, and then find it exercised to attain the end indicated, we may feel sure it is a power fairly intended to be granted, because entirely in accord with all the traditions and usages of our people.

To make this clear, suppose a charter for a city or town should be found that should forbid the governing body to restrain or regulate the inhabitants in openly exercising their ordinary occupations on Sunday, every man would feel that this was an anomaly in our legislation and a departure from all that was usage and tradition in the life of our State. It would be felt that inasmuch as the people were aggregated in a closer body in cities and towns that the ordinary occupations of life, if carried on this day, would here more effectually interfere with the habitual Sunday customs of our people than in the country, therefore the more need for authority to regulate and restrain and to prevent this in such localities.

But there is another view of this question which I wish to present. It is well known, as any other universally seen fact, that on Sunday our people in the main habitually attend some one of the many Christian churches in country or town, which make up another well known feature of the great civilization of which we are a part. That in these churches there is carried on in some one or other of the forms recognized by these various churches public services, in which the leading elements are worship of the one God of Christendom; and also, there is from some authorized agency, known as a minister, delivered a sermon or lecture, in which the tenets of his church may be the subject, but in all of which there is either directly, or as an undertone to all that is said and done, earnest and persistent enforcement of

the eternal obligations of duty and a sound morality as binding and imperative upon the conscience of all, enforced by what are deemed sanctions appealing to the highest hopes and fears that are found in the bosom of our common humanity. Who can estimate lightly (as we some times hear all this spoken of) the immense influence of all this moral and religious teaching upon the life of our people? Who would be willing, be he christian or skeptic, to have all these churches closed, these worships dispensed with, these sermons unheard, crude though many of them may be in thought—yet all bearing with more or less weight on the moral life of the hearers. That a sound morality is essential to the higher life of every community is conceded by us. That to conserve and strengthen such morality is as a matter of public policy one of the most, if not the supremely desirable end of social regulation, would not be hard to demonstrate. Without the sense of moral obligation making obedience to law a duty, and duty a "categorical imperative," so that the words "I ought" shall compel the action of a majority, law is an useless and idle utterance, for all know that if no one in a community, or a majority, did not deem law sacred, obedience could or would not be enforced. All agreeing to let it remain a dead letter on the statute book, crime and vice would soon reign supreme in our land. The peace and safety of our people is preserved far more by the conscientious sense of duty than by the penal sanctions of our law. It being clear that the moral culture of our people as a mass is almost en-

tirely derived, either directly or indirectly from the
influence brought to bear on the public conscience,
through the agency of the religious institutions for
worship and teaching, which do their work on Sun-
day, it follows that any regulation tending to increase
the efficiency of these agencies is one of vital public
concern, and demanded by the best interest of society.
If all the occupations of a great city, or even a vil-
lage, were permitted to be carried on as usual on
this the day consecrated to worship and moral teach-
ing, then it needs no argument to show that such
interruptions to such exercises would continually occur,
such prevention of attendance on the part of thou-
sands who would otherwise attend, that this mighty
source of moral influence would be weakened and
greatly enfeebled in its beneficent work. No commu-
nity can afford to permit any burden on the religious
instruction and moral life of its people without an
injury and deterioration that will tend to increase
crime and give vice dominance unless it will follow
the path that leads towards destruction to all the
highest and most sacred interests for which society is
organized. In view of these considerations, which a
wise and liberal view should be taken by legis-
lators in our towns and cities in so adjusting their
regulations as not on the one hand to interfere with
private or public interests of the secular class where
such interference does not tend to attain or bear di-
rectly on the desirable ends I have indicated, yet
within such reasonable bounds. I am prepared to
say all private gain must and should be subordinated

to the higher moral ends in which is enshrined so much of the best interests of the great social organism which serves the end of giving protection to life, liberty, property and reputation of all.

I am unable, after careful scrutiny, to find any thing in the ordinances complained of in violation of the rules I have stated, and therefore heartily agree with the conclusion of my brother, Cooke.