CITY OF LEBANON, Tennessee,
Plaintiff–Appellant,

v.

Edward B. BAIRD, Defendant–Appellee.

Edward B. BAIRD,
Counter–Plaintiff–Appellant,

v.

CITY OF LEBANON, Tennessee,
Counter–Defendant–Appellee.

Supreme Court of Tennessee,
at Nashville.

Aug. 15, 1988.

the allegedly negligent operation of a city vehicle, see 82 A.L.R.3d 1285, Safety Rules of

Municipal Corporation.

R. David Allen, Allison B. Humphreys, Lebanon, for City of Lebanon.

James H. Kinnard, Lebanon, Robert H. Jennings, Jr., Nashville, for Edward B. Baird.

## OPINION

DROWOTA, Justice.

Rule 11, T.R.A.P., Applications for Permission to Appeal were granted in this case to determine whether a contract entered into between Plaintiff, the City of Lebanon, and Defendant, Edward B. Baird, was *ultra vires* because it was not authorized by ordinance, as required by the Charter of the City of Lebanon. If not *ultra vires*, the issue becomes whether the City of Lebanon acted in good faith and with due diligence within the meaning of the terms of the contract, but if *ultra vires*, then

whether an estoppel or an implied contract arose between the parties.

## I.

The events culminating in the execution of the contract between the parties are essentially undisputed. In 1977, Edward B. Baird (Defendant) owned approximately 135 acres of land situated within the city limits of the City of Lebanon (City). This tract was zoned as residential property and Defendant had it platted for future subdivision development but had not yet placed any part of the property on the market for sale. During the summer of 1977, which was the last year of the administration of Mayor Jack Lowery, the City decided to develop a recreational park and officials of the City approached Defendant about purchasing some portion of the 135 acre tract owned by him. Defendant agreed to sell only the entire tract and was advised by the City that it planned to apply through the State of Tennessee, Department of Conservation, for a grant from the Bureau of Outdoor Recreation, United States Department of Interior, to assist the City in the acquisition of the property. In accordance with State and Federal regulations guiding park land acquisition, the price for Defendant's property was determined through the services of an independent appraiser; Defendant did not participate in the appraisal in any way. The appraiser determined that the price for the property was $365,000.

On July 30, 1977, the City Council adopted Resolution No. 77–506, which authorized the mayor to apply for a Bureau of Outdoor Recreation Grant in the amount of $250,000 and appropriated funds not to exceed an additional $250,000 from the City's Revenue Sharing Fund to match the grant and to acquire the Baird property for development as a park. This resolution was adopted at a regularly scheduled meeting of the City Council upon one reading, but no notice was given to the public by any form of publication. The application was submitted to the State and on September 21, 1977, the City received notice from State Conservation Commissioner B. R. Allison that a grant application would be submitted by the State on behalf of the City to the Bureau of Outdoor Recreation, but that due to the limited availability of Federal funds and the State's need to allocate these funds to assist as many projects as possible, the application would be reduced from $250,000 to $182,500, which equaled one-half the purchase price of the proposed park property. This letter did not constitute approval of the grant but merely informed the City of its eligibility to receive Federal funds if the State obtained the funds from the Bureau of Outdoor Recreation for this purpose. No problem was foreseen with eventually obtaining such funds, however.

On December 27, 1977, the City Council adopted Resolution No. 77–524, authorizing the mayor to purchase the Baird property for development as a park using funds to be obtained from a grant by the Bureau of Outdoor Recreation and from the unappropriated funds of the City. The resolution recited that the park was to be developed on a ten-year plan and that the purchase price of the property was $365,000. No notice to the public was given. Defendant's attorney drafted the contract on terms agreed to by the parties. On January 2, 1978, the parties executed a contract styled Option Agreement. This contract contained a recital that $90,000 was paid by the City to the Defendant upon execution and stated the terms and conditions of the sale of the property, including the grant of an exclusive option to the City under which the City had 90 days from the date of the agreement within which to exercise the option to purchase. One of the clauses of the contract provided:

"DEFAULT BY PURCHASER. It is agreed and understood that the purchaser is securing grant money to fund the purchase of this land from the State of Tennessee by means of a grant from the Department of Interior, Bureau of Outdoor Recreation of the Federal government and it is further agreed that the City will continue in its efforts to secure the said money and act in good faith and diligence to continue this project which is the development of a park and recreation

area. In the event the grant money is not secured through no fault of the City then this agreement is null and void except that the City will be required to pay all legal, accounting and professional fees attendant thereto.

"In the event the City does not use due diligence in continuing its efforts to secure the money or does not act in good faith the ninety thousand dollars ($90,-000.00) paid at the execution of this agreement shall be forfeited."

The contract also provided that the property would be conveyed to the purchaser at the closing by a warranty deed. A check for $90,000 was delivered by the City to the Defendant.

Shortly after the execution of this contract, a new administration, that of Mayor Willis Maddox, was inaugurated in January, 1978. This successor administration took no further action to secure the grant from the State. Rather, in assessing the ability of the City to fund the long-term park development project, the Maddox Administration concluded that the City did not have sufficient revenues to dedicate to carry out the planned park project. It also determined that a portion of the land was unsuited for park development.[1] On March 30, 1978, Jerry Dillehay, Chief of Planning and Grants, State Department of Conservation, communicated with Mayor Maddox to inquire whether the City intended to proceed with its grant application, stating that while the City was ranked first among eligible applicants and that the State would commit $182,500 of Federal funds for the City's proposed acquisition, "[a]t the present time [the application] has not been officially approved [by the Federal Government]." Mr. Dillehay requested the City to notify the State as to its intentions by April 15, 1978, so that the funds could be reappropriated should the City's application be withdrawn. The next day, on March 31, 1978, the mayor and City commissioner of finance and revenue wrote to Defendant, informing him that on March 27, 1978, the City Council had considered the exercise of

the option and had determined that, at the current rates of taxation, available revenue would be inadequate to fund the development of the proposed park and also provide sufficient City services. The City demanded return of at least part of the $90,000 paid to Defendant and suggested that Defendant consider the ramifications of the City's decision on his 1978 tax position. On April 14, 1978, the City notified Mr. Dillehay that the City Council had met in special session on March 23, 1978, and had voted to end negotiations for purchase of the Baird property for several reasons, including lack of funds and long-term fiscal inability to sustain the park development as planned.

Relying on the DEFAULT OF PURCHASER provision of the contract, Defendant refused to return any portion of the $90,000 to the City. On his 1978 Federal income tax return, the Defendant reported this $90,000 as ordinary income because no transfer of the property had occurred, precluding Defendant from taking advantage of the capital gains provisions of the tax code. The difference between the rate of taxation on the $90,000 as ordinary income, as compared to that for capital gains, increased Defendant's tax liability by $48,-000. The City continued to demand reimbursement of the $90,000 but failed to bring suit to recover the money until December 21, 1983, when it filed the instant action in the Chancery Court for Wilson County. The City's theories of recovery were that the contract was *ultra vires* and, alternatively, that the City acted in good faith and with due diligence in failing to exercise the option to purchase. Defendant asserted counter-claims, including breach of contract.

After much pretrial pleading and discovery, the case finally came to trial on July 14 and 15, 1986, and reached conclusion on July 21, 1986. The Chancellor entered his Memorandum Opinion on August 14, 1986. Finding that the parties had entered into an option contract, the Chancel-

---

1. Whether this would actually adversely affect the use of the land for park purposes was disputed by the parties at trial.

lor held that the failure of the City to enact an ordinance authorizing the contract pursuant to the requirements of the Charter of the City of Lebanon made the contract *ultra vires* and therefore void. The trial court specifically found that neither of the two resolutions was adopted with any of the required formalities of an ordinance under the City Charter. The trial court also found that the City had acted in good faith when it determined that it could not afford to develop the Baird property as a park and that Defendant had sustained no damages to his property or business interests as a result of the City's actions. Because the contract was void and unenforceable, the Chancellor ordered Defendant to reimburse the $90,000 paid by the City for the option; however, due to the City's delay in litigating the issue, no award of prejudgment interest, as pled by Plaintiff, was made by the trial court. An Order of Final Judgment was entered on September 4, 1986. Defendant duly filed his Notice of Appeal on September 24, 1986.

The Court of Appeals modified the judgment of the trial court, finding that the contract between the parties had the legal effect of an executory sales contract subject to a condition precedent. On this theory of the contract, the DEFAULT OF PURCHASER clause conditionally vested the $90,000 payment in Defendant and this payment was not in practical effect consideration for an option because it would be returned upon failure of the condition to be fulfilled. The sale was intentionally structured to minimize its impact on Defendant's tax position. Holding that the contract was not *ultra vires* but rather was *intra vires,* the Court of Appeals applied the principles of implied contract to the agreement, despite its determination that it was executory, because the City had induced Defendant to enter the contract. The Court below was of the opinion that the City could not rely on the invalidity of the contract when the Defendant had suffered a substantial detriment. While the City obtained some slight benefit under the agreement, the detriment suffered by Defendant, the increased tax burden of $48,000, was exacerbated because the statute of limitations on amendments to tax returns had passed when the City brought its action to recover the $90,000. The Western Section, sitting at Nashville, reduced the judgment by the amount of Defendant's taxes, $48,000, and also awarded Defendant $475.00 in legal fees he paid for the drafting and execution of the contract in 1978. The Court of Appeals then went on to find that the City failed to exercise good faith or to act with due diligence in its decision not to go through with the purchase of Defendant's property. We granted the Applications for Permission to Appeal filed by both parties. With the exception of the holding that the agreement constituted an executory sales contract subject to a condition precedent, we now reverse the judgment of the Court of Appeals and reinstate the judgment of the trial court with only slight modification.

## II.

### A.

The City of Lebanon was originally incorporated in 1819; its basic charter was enacted by the General Assembly under private acts. In 1929, the Legislature amended 1911 Private Acts, chapter 644, to provide for the present charter of incorporation. 1929 Private Acts, ch. 685. Under Article II, § 1, of the City Charter, the City

"shall have full power *by ordinance* within the corporate limits:

. . . . .

(7) To contract and be contracted with.

. . . . .

(11) To acquire, receive, and hold, maintain, improve, sell, lease, mortgage, pledge or otherwise dispose of property, real or personal, and any estate or interest therein, within or without the City or State, except such as may hereinafter be prohibited."

(Emphasis added.) The Charter then sets out a number of specific requirements for the enactment of a valid and binding City ordinance. Article III, § 15, requires

"[t]hat the affirmative vote of a majority of the members of the City Council shall

be necessary to adopt any ordinance or resolution of the City. Each and every ordinance or resolution passed by the City Council shall be signed by the presiding officer and the Commissioner of Finance and Revenue, and shall be filed with the Commissioner of Finance and Revenue...."

An enacting clause is required by Article IV, § 1, "[t]hat all ordinances shall begin 'Be it ordained by the City of Lebanon.'" Under Article IV, § 3,

"[e]very ordinance shall be passed *on two separate days* in open session of the City Council *before it shall become effective* ... and provided further, that resolutions may be passed on one reading. All ordinances and resolutions shall be signed by the Mayor and Commissioner of Finance and Revenue, and *all ordinances shall be published* at least once in a newspaper published in the City of Lebanon, or in pamphlet form, or by the posting ... at a conspicuous place at the [County] Courthouse ... and/or at the City Hall...."

(Emphasis added.) All ordinances are to be numbered and preserved, Article IV, § 4, and codified or maintained periodically in a compendium, Article XII, § 5. Moreover, Article III, § 6, addressing the City Council's general legislative and residual powers; states

"[t]hat the legislative and other powers, *except as otherwise provided by this charter*, are hereby delegated to and vested in the City Council and the City Council may, by ordinance or resolution, *not inconsistent with this charter*, prescribe the manner in which all powers of the City shall be exercised, provide all means necessary or proper therefor, and do all things needful within or without the City or State to protect the rights of the City...."

(Emphasis added.)

### B.

In the almost 200 years of this State's existence, a substantial and comprehensive body of law controlling the exercise of municipal powers has evolved. Fundamental in this law is that municipalities may exercise only those express or necessarily implied powers delegated to them by the Legislature in their charters or under statutes. *E.g., Barnes v. City of Dayton*, 216 Tenn. 400, 410, 392 S.W.2d 813, 817 (1965); *Adams v. Memphis & Little Rock R.R. Co.*, 42 Tenn. 645, 654 (1866). As the Court of Appeals stated in *Warren v. Bradley*, 39 Tenn.App. 451, 459, 284 S.W. 2d 698, 702 (1955), "it is universally recognized that municipal corporations can exercise no powers which are not in express terms, or by reasonable intendment, conferred upon them, and hence have no power [to do an act], in the absence of a charter provision or statutory enactment empowering them to do so either in express terms or by necessary implication." The charter is the organic law of the municipality to which all its actions are subordinate. *Marshall & Bruce Co. v. City of Nashville*, 109 Tenn. 495, 512, 71 S.W. 815, 819 (1902). *See also Wilgus v. City of Murfreesboro*, 532 S.W.2d 50, 52 (Tenn.App.1975). Moreover, "'[t]he provisions of the charter are mandatory, and must be obeyed by the city and its agents....'" *Barnes v. Ingram*, 217 Tenn. 363, 373, 397 S.W.2d 821, 825 (1965). When a municipality fails to act within its charter or under applicable statutory authority, the action is *ultra vires* and void or voidable. *Crocker v. Town of Manchester*, 178 Tenn. 67, 70, 156 S.W.2d 383, 384 (1941). Under Tennessee law, a municipal action may be declared *ultra vires* for either of two reasons: (1) because the action was wholly outside the scope of the city's authority under its charter or a statute, or (2) because the action was not undertaken consistent with the mandatory provisions of its charter or a statute. Thus, the law recognizes a difference between the existence of a municipal power and the manner or mode of exercising municipal power legitimately. *Compare City of Chattanooga v. Tennessee Electric Power Co.*, 172 Tenn. 524, 112 S.W.2d 385 (1938) (existence of power) *with Rutherford v. City of Nashville*, 168 Tenn. 499, 79 S.W.2d 581 (1935) (manner of exercise). As this Court observed in *Memphis Street Ry. Co. v. Rapid Transit Co.*, 138 Tenn. 594,

607–608, 198 S.W. 890, 893 (1917), "[i]t is to be observed that ... power existed in the municipality to [do the act] in question, but it was limited or qualified as to the mode of exercise. So it is in the case under review; power to act, proceeding properly, was not lacking, but the limitations on its exercise were not regarded."

When a municipality has no power whatsoever to do an act, that any attempt to undertake such action is *ultra vires* is readily seen;[2] the more difficult question is the consequences of a city's failure to do an authorized act in the manner prescribed by its charter or by the statute under which it is attempting to act. In some cases, if the City does an act that does not comply with the law controlling the manner in which it is to be done, the city will be estopped from denying the validity of its act for equitable considerations arising on the facts of the particular case, *Lawrence County v. White*, 200 Tenn. 1, 8, 288 S.W. 2d 735, 738 (1956), usually because the city has accepted the benefits of an act it induced another to perform, *e.g., Brown v. City of Manchester*, 722 S.W.2d 394, 397–398 (Tenn.App.1986), or because the city induced a detrimental act of another, *e.g., Bledsoe County v. McReynolds*, 703 S.W.2d 123, 124–125 (Tenn.1985). The application of equitable principles, such as estoppel or implied contract, does not change the conclusion that, as a matter of law, the city's action was itself *ultra vires* because it was not done in the required manner to make it *intra vires*.

Among the purposes served by express charter or statutory requirements that certain municipal actions be undertaken only through the adoption of an ordinance, with all its attendant formalities, aside from being consistent with, in the words of Justice Brock, "a fundamental goal of our system of government that, to the extent possible, we be governed by laws rather than by men," *Brooks v. Garner*, 566 S.W.2d 531, 532 (Tenn.1978), is to assure that the citizens of the municipality are adequately aware of the proposed action, its particular nature and costs, and are given an opportunity to voice their support or their opposition to the action in advance of the city's commitment to it. In many instances, the formal requirements of notice, multiple readings at separate sessions, the enacting clause, and publication are imposed to protect the taxpayers and because the type of action involved has substantial consequences for the rights and interests of the citizens. As this Court observed in *Metropolitan Government of Nashville and Davidson County v. Mitchell*, 539 S.W.2d 20, 21 (Tenn.1976), "the purpose of such ... charter provisions is to prevent hasty and ill-considered legislation." The Court compared such provisions to similar constitutional provisions controlling statutory enactments by the General Assembly. *Id.* These requirements rest ultimately on the premise that "[m]unicipalities are trustees for their citizens," *Warren v. Bradley, supra*, 39 Tenn.App. at 463, 284 S.W.2d at 704, and thus can be compared to the recognized obligation of all trustees to make full disclosure as fiduciaries.

Furthermore, the distinction between a resolution, which is essentially an administrative action, and an ordinance must be maintained by the city if its charter draws the distinction and requires it. In such case, an ordinance has the force of law; a resolution does not. If, however, more than one means or method of accomplishing a legitimate municipal goal is authorized, the city has the discretion to choose which means it will utilize. *South Central Bell Telephone Co. v. City of Chattanooga*, 578 S.W.2d 950, 952 (Tenn. App.1978). Nevertheless,

"[w]hile the general rule is that, when a charter commits the decision of a matter such as this, the making of a corporate contract of purchase, to the city council,

---

**2.** The harsh rule in such cases is that not even equity can generally save the action since it would not have been *intra vires* if it had been properly exercised. *See, e.g., Crocker v. Town of Manchester, supra*, 178 Tenn. at 70, 156 Tenn. at 384; *Memphis Street Ry. Co. v. Rapid Transit Co., supra*, 138 Tenn. at 608, 198 S.W. at 893; *Watterson v. Nashville*, 106 Tenn. 410, 424, 61 S.W. 782, 785 (1901). *See also Gray v. City of East Ridge*, 641 S.W.2d 204, 206 (Tenn.App. 1982).

and is silent as to the mode of exercise, the decision may be evidenced by a resolution, and need not necessarily be by an ordinance ... yet the legislative stipulation, here appearing, that the manner of exercise should be by way of ordinance made it incumbent, in order to [attain] validity, that such more deliberate form of authorization should have been adopted."

*Keenan & Wade v. City of Trenton,* 130 Tenn. 71, 80, 168 S.W. 1053, 1055 (1914) (citations omitted). *See also Brooks v. Garner, supra,* at 531–532 (statute requiring adoption of ordinance was mandatory). Regardless, in some cases at least, the law is not so literal that a municipal act denominated a resolution, but passed with all the requisite formalities of an ordinance otherwise in substantial compliance with the charter or statute, would be declared void solely for the reason that the municipality failed to call it an ordinance. " 'A resolution passed with all the formalities required for passing ordinances may operate as an ordinance regardless of the name by which it is called.' " *Clapp v. Knox County,* 197 Tenn. 422, 435, 273 S.W.2d 694, 700 (1954) (citations omitted). The procedure is itself essential to the validity of the act since it is this process that provides the protection to the citizens. "It is well settled that a municipal ordinance may be declared void when 'not passed regularly or according to the forms of law.' " *Brumley v. Town of Greeneville,* 38 Tenn.App. 322, 326, 274 S.W.2d 12, 14 (1954) (citation omitted). Thus, if a city charter requires that specified acts be taken through the adoption of an ordinance, the city has no authority to alter the manner of acting and reliance on a general provision of the charter cannot excuse its failure to conform to the specific or express requirements of the charter, which are considered mandatory. "The rule ... is, if the power to pass ordinances upon any subject is specifically given, the power so granted cannot be enlarged or changed by the general clause...." *Mayor and City Council of Nashville v. Linck,* 80 Tenn. 499, 508 (1883). For the city to ignore the distinction drawn by a charter between a resolution and an ordinance re-

sults in the act being *ultra vires. E.g., Terry v. Commissioners of Cookeville,* 184 Tenn. 347, 198 S.W.2d 1010 (1947). *Cf. Johnson City v. Cloninger,* 213 Tenn. 71, 372 S.W.2d 281 (1963); *Wilkey v. Cincinnati, New Orleans & Texas Pacific Railway Co.,* 47 Tenn.App. 556, 340 S.W.2d 256 (1960) (cases involving resolutions as opposed to ordinances).

### C.

If a city's action is *ultra vires,* not because the power has not been granted to it to act in the first instance, but because the city failed to exercise a power it has in the manner prescribed by controlling law, the question is what consequences flow from voiding the action. The answer depends on the nature of the attempted action and the facts of the particular case. When the city has attempted to enter a contract that is *ultra vires* because it was not entered into in the authorized manner, the issue is often presented as to whether the concepts of equitable estoppel or implied contract are applicable. In addition to the equities of the case, the application of these concepts depends on whether the contract is executory or partially or fully performed. The law of municipal corporations in Tennessee has long recognized the difference between executory and performed contracts with cities. As this Court noted in *Mayor and City Council of Nashville v. Hagan,* 68 Tenn. 495, 507 (1876); "where the contract is executory the corporation cannot be bound unless made in pursuance of provisions of its charter; but where the contract is executed, and the corporation has enjoyed benefit of the consideration, an assumpsit will be implied." In *Keenan & Wade v. City of Trenton, supra,* which involved a contract to purchase realty, that the contract had been performed and that the city had taken possession of the seller's property when the deed was transferred, thus accepting the benefit of the contract, made application of the concept of implied contract appropriate, despite the city's failure to conform to the requirements of the charter by not adopting an authorizing ordinance. 130 Tenn. at 80–84, 168 S.W. at 1055–1056. The clear corollary implied in

this case is that had the contract been executory, the *ultra vires* nature of it would have precluded enforcement by equity because no enduring benefit had passed to the city or no detriment had been suffered by the other party to the contract. This distinction between executory contracts and performed contracts that are *ultra vires* was recognized in a somewhat different context in *Harper v. Trenton Housing Authority*, 38 Tenn.App. 396, 411–412, 274 S.W.2d 635, 642 (1954). Furthermore, while the principles of implied contract or of estoppel can arise in some circumstances involving an *ultra vires* contract that would have been *intra vires* and valid but for the failure of the city to follow its required authorization procedures, such a contract may be subsequently ratified by the city. *Mayor and City Council of Nashville v. Hagan, supra*, 68 Tenn. at 503–504, 274 S.W.2d 635. Ratification must, however, conform to the procedure initially required by law for the contract to have been *intra vires* and thus must be done by an affirmative act, i.e., by ordinance if that would have originally been necessary to authorize the contract. *Id.*, at 504–505, 274 S.W.2d 635. *See generally State v. Ward & Briggs*, 56 Tenn. 100, 130 (1871) (ratification discussed).

▪ Ultimately, the application of estoppel or implied contract must be determined on the facts and equities of the particular case. The principles of estoppel are well settled and not every case will require application of estoppel or of implied contract. The classic case of estoppel in the present context is the acceptance of the benefits of a contract and the subsequent refusal of a city to pay for the benefits received. *See, e.g., Trull v. City of Lobelville*, 554 S.W.2d 638, 641–642 (Tenn.App.1976). For estoppel to arise, the act must have been done with the knowledge that it would be relied upon and the other party has acted in reliance without either knowledge of the true state of affairs or the means of learning the true state of affairs. *E.g., Early Co. v. Williams*, 135 Tenn. 249, 261, 186 S.W.

102, 105 (1916). "When both parties have the same means of ascertaining the truth, there can be no estoppel." *Id.* (citations omitted). *See also Rambeau v. Farris*, 186 Tenn. 503, 508, 212 S.W.2d 359, 361 (1948). Moreover, when entering a contract with a municipality, "[o]ne dealing with municipal officers, boards, or committees is bound at his peril to take notice of the limitation of their authority." *Kries & Co. v. City of Knoxville*, 145 Tenn. 297, 305, 237 S.W. 55, 57 (1921). The contents of a city charter are public and readily available to all who deal with a city. *Nashville v. Sutherland & Co.*, 92 Tenn. 335, 339–340, 21 S.W. 674, 675 (1893).

> " 'In determining the extent of the power of a municipal corporation to make contracts, and in ascertaining the mode in which the power is to be exercised, the importance of careful study of the charter or incorporating Act ... can not be too strongly urged. Where there are express provisions on the subject, these will, of course, measure, as far as they extend, the authority of the corporation.' "

*Id.*, 92 Tenn. at 338, 21 S.W. at 675 (citation omitted).[3]

▪ Because the power of a city to contract is based upon the expenditure of city funds, it

> "is equivalent in its character to the power to levy, collect, and disburse taxes, inasmuch as, if the contract be valid, it must be complied with, and the price agreed to be paid must be raised by taxation, and paid out under the appropriations of the proper city government. The power to make such a contract, being equivalent in general to the power to levy and disburse taxes, must be exercised in the same manner and by the same authority, that is, by a corporate act."

*Mayor and City Council of Nashville v. Hagan, supra*, 68 Tenn. at 500–501, 274 S.W.2d 635. Consequently, the law pro-

---

**3.** "It is not requiring too much that parties dealing with municipal agents should inform themselves of the extent of their authority, as well as the essentials of a valid contract." *Watterson v. Nashville, supra*, 106 Tenn. at 424, 61 S.W. at 785.

tects the citizens of the municipality from the waste of city funds and the resulting unnecessary burden of taxation. " 'Municipal corporations represent the public, and are themselves to be protected against the unauthorized acts of their officers when it can be done without injury to third parties. Persons dealing with such officers are chargeable with notice of the powers which the corporation possesses, and are held responsible accordingly.' " *Nashville v. Sutherland & Co., supra,* 92 Tenn. at 344, 21 S.W. at 676 (citation omitted). *Cf.* T.C.A. § 6–2–103. Nevertheless, a municipality will not be permitted to rely intentionally upon unauthorized acts or to take advantage of such acts to avoid its obligations or to work a fraud, actual or constructive, upon an innocent party who has been induced by the corporation to rely upon an act and who has reasonably relied upon that act. *E.g., Adams v. Memphis & Little Rock R.R. Co., supra,* at 662–663. Thus, the concepts of estoppel or of implied contract have been used to remedy the unjust enrichment of a city.

### III.

In the case *sub judice,* the City failed to enact an ordinance authorizing the contract it entered into with Defendant. The two resolutions adopted to attempt to achieve what was otherwise a permissible city purpose, i.e., the acquisition of land for use as a public park,[4] were not adopted with any of the requisite formalities of an ordinance and cannot be treated as providing authorization for the contract. The City Charter distinguishes between resolutions and ordinances in several provisions and specifically requires that contracts as well as a number of other actions, including the acquisition of property, be undertaken by ordinance; thus, the contract could be validly undertaken through no other means. To permit the City to exercise such power by resolution rather than ordinance would be inconsistent with the express requirements of the Charter. The

only conclusion we can reach is that the contract was *ultra vires.* It was, however, an act *ultra vires* in the sense, not that it was not authorized by the Charter, but because it was not authorized by compliance with the terms of the Charter for the binding exercise of such a power. A substantial commitment of the City's funds was involved and the City could commit these funds in no other manner than by the adoption of an ordinance in conformity with the procedures mandated by the Charter. Although Defendant contends that the City has entered other contracts in this same manner, i.e., by resolution, this cannot change the fact that this contract was *ultra vires* and does not constitute a defense in this case; these other contracts are matters for the City to resolve, if necessary, with these other parties. The Charter is mandatory and its provisions cannot be waived by a pattern of practice. The question is, thus, whether estoppel or implied contract should apply in this case. This depends on the facts and equities.

The contract between these parties was executory. The City had not taken possession of the land; the deed had not been transferred. No evidence demonstrates that the City intended to take any advantage of the fact that the contract was not authorized. On the contrary, in a timely fashion, within the 90 day period provided by the contract itself, the City determined that it could not afford to purchase the Defendant's property or to fund the park development and notified the Defendant of its decision. At the time the City approached the Defendant, the property was not for sale and whether Defendant would have attempted to sell it if the contract had not been executed is not apparent from this record. To the extent that the Defendant suffered any detriment as a result of the City's inducement to sell, he was required to expend $476.00 to prepare the contract, but the City's inducements did not alone cause Defendant to suffer an in-

---

4. T.C.A. § 11–24–102, under which the City did not choose to act, constitutes an alternative, discretionary method by which the City could acquire property for recreational purposes, but in this case the City Charter was sufficient of itself to allow the City to undertake the park project.

creased tax liability. The City notified Defendant well in advance of the time his 1978 tax return was due to be filed and suggested that he take precautions to protect his tax position when the $90,000 payment was reimbursed. Neither the Defendant nor the City took any timely action to resolve the continuing controversy between them. Defendant knew that the City had repudiated the contract and could have determined from an examination of the City Charter that the contract was not properly authorized by ordinance, but he failed to take action to resolve the dispute while he could still file an amended tax return. Failure to inquire into the authority of the City to make the contract before entering it does not weigh in Defendant's favor, but failure to make such an inquiry before relying upon it to his detriment cannot be seen as reasonable. The benefits to the City were minimal and temporary under the contract; the detriment suffered by Defendant, in excess of the legal fees associated with entering the contract itself, was in substantial part due to his own dereliction. He failed to attempt to mitigate his damages while he could. Moreover, Defendant received the benefit of using the $90,000 throughout the period of the dispute.

When the equities are weighed in the context of the facts of this case, we cannot say that Defendant did not share culpability with the City or that his reliance on the contract was reasonable in light of what he could have discovered about the City's authority and done to mitigate his damages. While we certainly do not condone the manner in which the City has dealt with Defendant, not only in its failure to authorize the contract but in failing to act in a timely manner to bring the dispute to final resolution, we do not believe that estoppel is appropriately applicable to this case, which involves an executory contract, except to the extent that Defendant spent legal fees in the preparation and execution of the contract itself.

Accordingly, we reverse the judgment of the Court of Appeals and reinstate the judgment of the trial court. We order that Defendant reimburse the City $89,524.00 ($90,000.00 less $476.00). Considering the equities and the undue delays in litigating this case, we believe that justice will be best served by precluding an award of postjudgment as well as prejudgment interest. The costs are divided equally between the parties. The case is remanded to the Chancery Court for Wilson County for entry of any necessary orders.

HARBISON, C.J., and FONES, COOPER and O'BRIEN, JJ., concur.