IN THE COURT OF APPEALS
AT KNOXVILLE

FILED

APRIL 16, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

THE CITY OF CLEVELAND, TENNESSEE    )  BRADLEY COUNTY
                                  )  03A01-9804-CV-00140
     Plaintiff-Appellant      )
                                  )
                                  )
     v.                          )  HON. EARL H. HENLEY,
                                  )  CHANCELLOR
                                  )
BRADLEY COUNTY, TENNESSEE       )
                                  )
     Defendant-Appellee       )  AFFIRMED AND REMANDED

WILLIAM P. BIDDLE, III, OF CLEVELAND FOR APPELLANT

JAMES S. WEBB OF CLEVELAND and BRIAN L. KUHN OF MEMPHIS FOR
APPELLEE

O P I N I O N

Goddard, P.J.

This is a declaratory judgment action initiated by the City of Cleveland to determine whether the agreements it had with Bradley County concerning the division of one-half of the Local Option Revenue Tax were terminable. The City also sought its share of various Capital Outlay Notes issued by Bradley County for educational purposes.

I. FACTS

The 1963 Local Option Revenue Act[1] authorized a county to levy a local sales tax on all retail sales within the county. Bradley County levied a local sales tax of 2.25%. This tax has been collected by the State of Tennessee, for distribution to Bradley County and the City by the Commissioner of Revenue for the State of Tennessee since 1967.

T.C.A. 67-6-712 provides for one-half of the proceeds to be distributed in the same manner as the county property tax for school purposes. The second one-half is to be distributed according to where the tax was collected, either inside the City limits or outside in Bradley County. T.C.A. 67-6-712(a)(2)(C) authorizes a county and city to enter into a contract to provide for other distribution of the second one-half of the tax collections.

On March 7, 1967, the Board of Mayor and Commissioners of the City held a special called meeting dealing solely with the issue of whether to enter into an agreement whereby the second one-half of the collected tax receipts would be distributed in the same manner as the county property tax for school purposes. At that time most of the collected tax receipts would be collected outside the City limits. The Notice and Waiver of Call Meeting was signed by all the Commissioners and the Mayor. The resolution was unanimously adopted and was signed by the Mayor.

On May 10, 1967, Bradley County and the City entered into a Contract for the distribution of the other one-half of the local sales tax receipts. The contract in pertinent part provides for distribution as follows:

---

[1]T.C.A. 67-6-701, *et seq.*

2

1. One-half of the net proceeds from the local sales tax received by Bradley County from the State of Tennessee shall be used exclusively for school purposes and shall be appropriated to Bradley County and the City of Cleveland for school operational purposes as provided in T.C.A. 67-3052(1).

2. The remaining one-half of the net proceeds from the local sales tax received by Bradley County from the Department of Revenue of the State of Tennessee, being that portion distributable according to Section 67-3052(2) of Tennessee Code Annotated, shall be distributed between Bradley County and the City of Cleveland by reversing the percentages in Paragraph 1 herein and distributing the same to the City of Cleveland and Bradley County in accordance with the reverse percentages of Paragraph 1.

3. This formula for the distribution of the second one-half of the net proceeds from the local sales tax shall be used to distribute the same until such time as the average daily attendance of children in the two school systems shall reach 50% percent for each system at and from which time the second one-half of said proceeds shall be distributed by each system, taking the same per cent as it received in distribution of the first one-half of said proceeds.

An amendment to the Contract was authorized by a resolution of the Board of Mayor and Commissioners of the City, at a regular meeting held on January 10, 1972. On February 21, 1972, the parties entered into an Amendment to the Contract, agreeing that the funds from an additional sales tax to be levied in Bradley County would continue to be divided in accordance with

the original Contract.  It was signed by the Mayor. The City's

Charter[2] was silent as to the power to contract.

Bradley County entered into a Contract for

Administration of the Bradley County Local Sales and Use Tax with

the Department of Revenue of the State of Tennessee.  The

Contract was effective as of June 1, 1967,[3] and provided for its

termination in paragraph 7.[4]

---

[2]The City's Charter, which was in effect during the relevant time
period, provided as follows:
    Article 4
    Legislative body to be Board of Mayor and commissioners
    The legislative power of The City of Cleveland shall be exercised
    by the Board of Mayor and commissioners elected under the
    provisions of the charter of said City.
    * * *
    Article 18
    General Ordinance Power
    The Board of Mayor and Commissioners shall have such power and
    authority to pass all bylaws and ordinances necessary to enforce
    the powers herein granted as is not inconsistent with the
    Constitution and laws of the United States, the State of
    Tennessee, or the provisions of this chapter.

    Article 19
    Passage of Ordinances and Resolutions
    The style or introductory clause of all ordinances shall be: "Be
    it ordained by the Board of Mayor and Commissioners of The City of
    Cleveland."
    Every ordinance and resolution upon final passage shall be signed
    in open meeting by the Mayor or Mayor pro tem and at least one
    other Commissioner, and it shall thereupon be delivered to the
    City Clerk, whose duty it shall be to copy it in a book to be kept
    for that purpose, together with the signature of the Mayor and
    commissioners.. . .

[3]It was executed by the parties on June 13, 1967.

[4]7.  CANCELLATION OF CONTRACT.  It is understood and agreed that this
contract may be canceled upon the occurrence of any one of the following
events:
a.    The Department or County may give the other party six month's notice
      that it no longer desires the agreement to be effective.
b.    The Department shall have the right to cancel this agreement immediately
      upon any breach by the County of any provision of this agreement, or of
      any provision contained in the statute, resolution of adoption, rules
      and regulations pertaining thereto, or the terms of this agreement.  In
      the event of such cancellation by the Department, the Department's
      obligation shall extend only to make collection of the local tax for the
      remainder of the current month, and make to the county a proper
      distribution with respect to such collection.
c.    The resolution imposing the local sales or use tax shall be repealed, as
      provided for in Section 67-3055, T.C.A.

The City filed suit against Bradley County contending that if the proceeds had been distributed in accordance with T.C.A. 67-6-712(a)(2)(B), rather than according to the Contract and the Amendment, the City claims that it would have received from the sales tax collections the following additional amounts:

| FISCAL YEAR | ADDITIONAL REVENUES |
|---|---|
| 1992-1993 | $    668,518 |
| 1993-1994 | 798,007 |
| 1994-1995 | 992,430 |
| 1995-1996 | 967,693 |
| TOTAL | $  3,417,646 |

The City sought to have the trial court determine that the Contract was *ultra vires* or as an alternative that the Contract did not contain a termination clause and consequently it was a Contract in perpetuity and therefore against public policy. If the trial court so found, then the City would be able to terminate the Contract, which was it ultimate goal so that more monies would flow into its coffers under the statutory division of the second one-half of the tax proceeds.

B.  THE CAPITAL OUTLAY NOTES

Beginning in 1989, Bradley County issued Capital Outlay Notes for educational purposes pursuant to T.C.A. 9-21-101, *et seq*. the Local Government Public Obligations Law. Each of the Notes were issued pursuant to resolutions of Bradley County Commission. In each resolution, Bradley County "pledged its taxing power as to all taxable property in Bradley County,

5

Tennessee for the purpose of providing funds for the payment of the principal and interest on the notes."

| DATE | PURPOSE | AMOUNT |
|---|---|---|
| 2/20/89 | Valley View School Project | $ 262,000 |
| 9/18/89 | Various School Projects | 500,000 |
| 1/25/91 | School Capital Projects | 750,000 |
| 9/01/92 | School Buses | 102,000 |
| 2/26/93 | School Capital Projects | 775,000 |
| 6/29/93 | School Capital Projects | 3,500,000 |
| 12/05/94 | School Capital projects | 600,000 |
| | TOTAL | $ 6,489,000 |

Bradley County repaid the Notes from tax revenues collected on all property in Bradley County, including property inside the corporate limits of the City. None of the proceeds of the Notes was designated by Bradley County for the use of the schools operated by the City.

T.C.A. 49-3-1001, *et seq.*, grants counties the authority to issue bonds for educational purposes. From the proceeds of any borrowing for school purposes, T.C.A. 49-3-1001(b)(1) requires the trustee of Bradley County to pay over to the City the amount of funds in the same ratio as the average daily attendance between the City's school system and the Bradley County School System. During the years in which the Notes were issued by Bradley County, the applicable average daily attendance of students in the City's School System as a percentage of the total enrollment of students in Bradley County was as follows:

6

| ADA PERCENTAGE | | |
|---|---|---|
| YEAR | CITY | COUNTY |
| 1986-87 | 32.48% | 67.52% |
| 1987-88 | 31.81% | 68.19% |
| 1988-89 | 32.27% | 67.73% |
| 1989-90 | 32.34% | 67.66% |
| 1990-91 | 32.33% | 67.67% |
| 1991-92 | 32.90% | 67.10% |
| 1992-93 | 32.99% | 67.01% |
| 1993-94 | 33.62% | 66.38% |
| 1994-95 | 33.61% | 66.39% |
| 1995-96 | 33.98% | 66.02% |

The City contended that it was entitled to $2,128.995, which is its share of the funds based on the ADA in its schools.

| YEAR | GROSS AMOUNT | ADA PERCENTAGE | | CITY'S SHARE |
|---|---|---|---|---|
| | | CITY | COUNTY | |
| 1987-88 | $ 262,000 | 31.81% | 68.19% | $ 83,342 |
| 1988-89 | 500,000 | 32.27% | 67.73% | 161,350 |
| 1989-90 | 750,000 | 32.34% | 67.66% | 242,550 |
| 1990-91 | 102,000 | 32.33% | 67.67% | 33,558 |
| 1991-92 | 4,275,000 | 32.90% | 67.10% | 1,406,475 |
| 1992-93 | 600,000 | 32.99% | 67.01% | 201,720 |
| TOTALS | $ 6,489,000 | | | $ 2,128,995 |

## II.  HOLDING OF THE TRIAL COURT

Both parties filed motions for summary judgments based upon the facts stated above and their respective theories. Chancellor Earl H. Henley, sitting by interchange, found in regard to the declaratory judgment portion of the complaint that Bradley County's motion for summary judgment should be granted. The trial court found that the Contract was not *ultra vires*. Moreover, Chancellor Henley declared that the Contract was not a

7

Contract in perpetuity and that paragraph 3 of the Contract dated May 10, 1967, set a specific time or event that triggered termination of the Contract and the 1972 Amendment. Accordingly, the Contract was not terminable by the City and should remain in full force and effect according to the Contract's terms.

As to the money judgment portion of the complaint, Chancellor Henley found that the City's motion for summary judgment should be granted. He entered a judgment in favor of the City against Bradley County in the amount of $2,128,995. This amount was the City's *pro rata* share of the aggregate amount of Notes issued by Bradley County for educational purposes.

The City appealed the portion of the judgment granting Bradley County's motion for summary judgment concerning the Contract and the Amendment. Bradley County appealed the portion of the final judgment denying Bradley County's motion to dismiss and granting the City's motion for summary judgment on the money judgment portion of the Complaint.

III. ISSUES

Each party presents one main issue with many sub-issues for our consideration.

The City primarily contends that the trial judge was in error in holding that the Contract and its subsequent Amendment concerning the disposition of a portion of the Local Option Sales Tax contained a specific time or event that triggered termination of the Contract; therefore, the Contract was not in perpetuity and terminable by the City.

8

Bradley County, however, claims that the Chancellor Henley was in error in his granting the City's Motion for Summary Judgment as to the money judgment portion of the Complaint and in entering a judgment awarding the City its *pro rata* share ($2,128,995) of the aggregate amount of the Notes issued by Bradley County for educational purposes.

IV.   LAW AND DISCUSSION

Both of the awards by the Chancellor in this matter were based on motions for summary judgment. Since a motion for summary judgment involves only a question of law, no presumption of correctness attaches to the Chancellor's decision. Our standard of review of a trial court's grant of summary judgment is well-settled:

> Tenn.R.Civ.P. 56.03 provides that summary judgment is only appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993); and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. Anderson v. Standard Register Co., 857 S.W.2d 555, 559 (Tenn. 1993). The moving party has the burden of proving that its motion satisfies these requirements. Downen v. Allstate Ins. Co., 811 S.W.2d 523, 524 (Tenn. 1991).  When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact. Byrd, 847 S.W.2d at 215.

Nelson v. Martin, 958 S.W.2d 643, 646-647 (Tenn.1997).

We shall view the record in this matter in the light of those requirements.

A.   The Contract and Amendment were *Ultra Vires.*

The first sub-issue proffered by the City is that the Contract and Amendment are *ultra vires* because they were authorized by Resolution and not Ordinance as required by the City's Charter and were not adopted in accordance with the provisions of the Charter.

McQuillin Mun. Corp. § 15.01, Definitions (3rd Ed.) p.54, defines the term "ordinance" as designating "a local law of a municipal corporation, duly enacted by the proper authorities, prescribing general, uniform, and permanent rules of conduct, relating to the corporate affairs of the municipality...The passage of an ordinance is, of course, a legislative act, a legislative function, and equivalent to legislative action."  An ordinance prescribes some permanent rule of conduct or government, to continue in force until the ordinance is repealed.[5]

A resolution can be any type of non-legislative action and in effect encompasses all actions of the municipal body other than ordinances. It deals with matters of a special or temporary character and is simply an expression of opinion or mind or policy concerning some particular item of business coming within the legislative body's official cognizance, ordinarily ministerial in character and relating to the administrative business of the municipality.[6]

---

[5]McQuillin Mun. Corp. § 15.02, Resolutions and Ordinances Distinguished (3rd Ed.)

[6]McQuillin Mun. Corp. § 15.02, Resolutions and Ordinances Distinguished; § 15.08, Nature, Requisites and Operation of Municipal Ordinances (3rd Ed.).

Resolutions need not be, in the absence of some express requirement, in any set or particular form.  Julian v. Mayor, Councilmen & Citizens of Liberty City of Liberty, 391 S.W.2d 864 (Mo. 1965); McQuillin Mun. Corp. § 15.08, Nature, Requisites and Operation of Municipal Ordinances, (3rd Ed.). A resolution, particularly when used to express a ministerial act, need not partake of any definite form and need not be a written instrument.  Steward v. Rust, 221 Ark. 286, 252 S.W.2d 816 (1952).

> "Under Tennessee law, a municipal action may be declared *ultra vires* for either of two reasons: (1) because the action was wholly outside the scope of the city's authority under its charter or a statute, or (2) because the action was not undertaken consistent with the mandatory provisions of its charter or a statute."

City of Lebanon v. Baird, 756 S.W.2d 236, 241 (Tenn. 1988).

We have conducted an exhaustive review of the Charter as it was in 1967 and 1972.[7] The Charter is totally silent as to the method of passing a resolution and as to the power to contract.[8]

---

[7]Since then, the City of Cleveland has a new form of government and a new Charter.  The new Charter specifically provides that before the City of Cleveland can contract it must pass an ordinance to do so.

[8]Article 1 of the Charter provides for the Town of Cleveland to be a "body politic and corporate" and gives the City the general powers to receive, hold and dispose of personal property.
    Article 5 requires the members of the Board of Mayor and Commissioners to hold regular monthly meetings.  It is silent as to any called meetings.  However, Article 20, which deals with franchise ordinances, says that a franchise ordinance cannot be passed except on three readings with "not more than one reading at the same meeting, or on any reading at any but a regular meeting."  This implicitly indicates that there may be called or special meetings.
    Article 18 gives to the Board of Mayor and Commissioners the power to pass all by-laws and ordinances necessary to enforce the powers in the Charter.  There is no mention of resolutions.
    Article 19 details the passage of ordinances, bills, and by-laws.  While it cites "resolutions" in its heading, there is no reference to resolutions in the body of the article.
    Article 21 enumerates the miscellaneous powers and authority *by ordinance* of the Board of Mayor and Commissioners.  The power to contract is

Moreover, 19 Tenn. Juris., *Municipal Corporations,* §
70, states the following:

> In determining the extent of the power of a
> municipal corporation to make contracts, and in
> ascertaining the mode in which the power is to be
> exercised, the importance of a careful study of the
> charter or incorporating act and of the general
> legislation of the state on the subject, if there be
> any, cannot be too strongly urged.  Where there are
> express provisions on the subject, these will, of
> course, measure, as far as they extend, the authority
> of the corporation.  The power to make contracts, and
> to sue and be sued thereon, is usually conferred in
> general terms in the incorporating act.  But where the
> power is conferred in this manner, it is not to be
> construed as authorizing the making of contracts of all
> descriptions, but only such as are necessary and usual,
> fit and proper, to enable the corporation to secure or
> to carry into effect the purposes for which it was
> created; and the extent of the power will depend upon
> the other provisions of the charter prescribing the
> matters in respect of which the corporation is
> authorized to act.  To the extent necessary to execute
> the special powers and functions with which it is
> endowed by its charter, there is, indeed, an implied or
> incidental authority to contract obligations, and to
> sue and be sued in the corporate name.[9]

The general rule is that where a charter commits the
decision of a matter to the council or legislative body alone,
and is silent as to the mode of its exercise, the decision may be
evidenced by resolution.  Eichenlaub v. City of St. Joseph, 113
Mo. 395, 21 S. W. 8 (1893); Keenan & Wade v. City of Trenton,
130 Tenn. 71, 168 S.W. 1053 (1914).  The rule unquestionably is
applicable to the performance of a ministerial act or
administrative business of a municipality.  If there is not
general provision a charter outlining what must be done by
ordinance, and the charter does provide that some particular
things shall be done by ordinance, the implication is that

not mentioned.

[9]Mayor of City of Nashville v. Sutherland, 92 Tenn. 335, 21 S.W. 674
(1893); Crocker v. Town of Manchester, 178 Tenn. 67, 156 S.W.2d 383 (1941).
[footnote in original.]

12

matters which are not specifically required to be dealt with by ordinance may be dealt with otherwise.[10]

Under the facts of this case, the municipal action was not outside the scope of the City's authority because T.C.A. 67-6-712(a)(2)(C) provides that a county and city may contract to provide for other distributions of the one-half of the proceeds, which is not allocated to school purposes. Since the Charter was silent as to the contracting power of the City, but was specific in other instances, we deduce that the City's mayor had the authority to enter into the Contract with Bradley County, since it was for a system of free schools and at that time was in the City's best interest. 19 Tenn. Juris., *Municipal Corporations,*

§ 89 (1985). We find no merit in the City of Cleveland's assertion that the Contract is *ultra vires*.

Secondly, the City argues that if the Contract is found not to be *ultra vires* then the term of the Contract is in perpetuity for there is no termination clause in the Contract. Bradley County takes the position that even if the Contact between the City and Bradley County contains no termination provision, then the contract between Bradley County and the State does and it was incorporated into the Contract between Bradley County and the City. We do not need to address that issue, however, because we are in agreement with the trial court that paragraph 3 of the Contract contains the Contract's termination provisions. Paragraph 3 of the Contract provides that when the average daily attendance of children in the two school systems reaches fifty percent for each system then the distribution of

---

[10]McQuillin Municipal Corporations, § 15.06, Nature, Requisites and Operation of Municipal Ordinances (3rd Ed. Revised).

the proceeds would revert back to the division provided in the Code. The Contract contains no provision for a continuation of the division of proceeds after the point that the ADA equals 50%. That is, if the ADA at the City's schools the year after the 50-50 year go to 60%, the City does not receive 60% of the second half of the tax proceeds. There is no further provision in the Contract for the Contract to continue in effect in any manner. At this point, in order to deviate from the Code provisions, a new contract would have to be negotiated. We find that the Chancellor was correct in his holding that paragraph 3 was the Contract's termination clause.

Thirdly, the City argues that the trial court's decision is against public policy in that future city council members would be tied to a contract relating to government matters. In support of its position the City quotes from Shelbyville v. State ex rel. Bedford County, 220 Tenn. 197, 415 S.W.2d 139, 145 (1967) as follows:

> Thus, where the contract involved relates to governmental or legislative functions of the counsel, or involves a matter of discretion to be exercised by the council unless the statute conferring power to contract clearly authorizes the council to make a contract extending beyond its own term, no power of the council so to do exists.

We do not agree, however, because our Tennessee Legislature was the empowering authority which granted the right to contract one-half of the proceeds of the local tax revenues. The Tennessee legislature also enacted T.C.A. 7-51-903 pertaining to long-term contracts, which provides:

> Except as otherwise authorized or provided by law, municipalities are hereby authorized to enter into long-term contracts for such period or duration as the

14

municipality may determine for any purpose for which short-term contracts not extending beyond the term of the members of the governing body could be entered; provided, that the provisions of § 7-51-902 shall govern the periods or terms of contracts, leases, and lease-purchase agreements with respect to capital improvement property.

Our Supreme Court in 1985 addressed this issue in Washington County Board of Education v. MarketAmerica, 693 S.W.2d 344 (Tenn. 1985). The City's argument is basically the same as was that of the plaintiff in Washington County Board of Education. Justice Drowota opined:

> After carefully considering the respective arguments of counsel and the relevant legal authorities, this Court is of the opinion that the contract entered into between MarketAmerica, Inc. and the Washington County Board of Education is valid and binding upon both parties. Because of the importance of the issues in this case to local governments, we are compelled to elaborate on our reasons for this conclusion.
>
> * * *
>
> Plaintiff's argument that Chapter 186 of the Public Acts of 1983 acknowledged that counties were without authority to enter into long-term contracts prior to that legislation is not supported by the legislative history. Senator Cohen and Representative Burnett, the Senate and House sponsors of the bill, indicated that the bill "only clarifies what cities could always do." One sponsor further stated that the legislation was intended to clarify the law in this area because an opinion of the Attorney General had suggested that counties lacked the capacity to enter into contracts requiring payments beyond the current fiscal year. The new legislation and the debate concerning it illustrates that the legislature never intended that Chapter 2 of Title 49 serve as a limitation upon the authority of counties to enter into long-term contracts.

Washington County Board of Education, at 348-349. We also find that a valid Contract exists between the City and Bradley County. The City having received the benefit of its bargain in the early years of the Contract period, is obligated to honor its Contract with Bradley County during the period when Bradley County is

receiving its benefit.  The City's argument falls far short of convincing us of any merit in its position on this issue.

Fifthly, the City argues that since Article 20 of the Charter limits the power of the City to grant a franchise to only 20 years that therefore the Contract at issue here is void.  By its own wording, Article 20 deals specifically with franchises and not to the disbursement of the local tax revenues at issue here.  Again, we find no merit in the City's arguments on the Contract interpretation portion of this matter and affirm the Chancellor's decision on this issue in toto.

### B.  AFFIRMATIVE DEFENSES FOR THE MONEY DEBT

At the outset of our discussion we will address Bradley County's affirmative defenses that the City's complaint should be dismissed because (1) the trial court did not have jurisdiction because of the City's failure to file a petition for writ of certiorari, and, (2) because the City failed to make all persons who have or claim any interest parties of this proceeding; and, (3) the statute of limitations codified at T.C.A. 28-3-109 mandates the dismissal of the declaratory judgment action and claims on any capital outlay notes issued before 1991.

### 1.

We will first address the issue of the City's filing a declaratory judgment rather than a writ of certiorari.  In Fallin v. Knox County Board of Commissioners, 656 S.W.2d 338 (Tenn.1983) the Supreme Court held that T.C.A. 27-9-101, *et seq.*, is not applicable unless there is a judicial or quasi judicial determination by the governmental board involved. The court,

16

treating the issue before it as one for declaratory judgment,
quoted with approval from Holdredge v. City of Cleveland, 218
Tenn. 239, 402 S.W.2d 709 (1966) as follows:

> The remedy by certiorari provided in T.C.A. 27-
> 901, *et seq.*, "was intended to have application only in
> a review of an order or judgment rendered after a
> hearing before a board or commission." Stockton v.
> Morris & Pierce, 172 Tenn. 197, 110 S.W.2d 480 (1927).
> 402 S.W.2d at 712.
>
> We are convinced the validity of the ordinance
> amending the zoning ordinance may be tested under our
> Declaratory Judgment Act and that certiorari is not the
> exclusive remedy. 402 S.W.2d at 713-14.

Fallin, at p. 341-342.

The issues before us here are not judicial or even
quasi judicial determinations and therefore, T.C.A. 27-9-101, *et
seq.*, does not apply.

2.

Bradley County next claims that all parties necessary
to this suit are not before this Court. Relying upon Huntsville
Utility District of Scott County v. General Trust Co., 839 S.W.
2d 397, 400 (Tenn.App. 1992), Bradley County then argues that the
Complaint should have been dismissed because all necessary
persons were not before the court. We disagree.

All of the capital outlay notes have been repaid by
Bradley County, therefore, the City's Board of Education and the
Bradley County School Board are not necessary or proper parties.
The trustee of Bradley County is not a party to either the
contract or the amendment. No party is declaring that the
capital outlay notes were improperly issued or that the Local

17

Public Obligations Act is unconstitutional. As in any contract action the parties to the contract are necessary parties, and the parties to the contract and the amendment are before the court. There is no merit to this argument.

3.

Bradley County's third affirmative defense pertains to the statute of limitations codified at T.C.A. 28-3-109. It relies upon Ferguson v. Peoples National Bank of Lafollette, 800 S.W.2d 181, (Tenn. 1990). In this matter, however, T.C.A. 28-3-109 has no application to either the Complaint for declaratory judgment and/or the Complaint for money debt by the City. City of Maryville v. Blount County, filed on January 6, 1993, an unreported opinion of our Court, held that a municipality acts as an arm of the state and is exempt from the statute of limitations when it seeks to recover local education funding which should have been allocated to it pursuant to state education legislation. Bradley County's argument on this issue also fails.

C. CAPITAL OUTLAY NOTES

Bradley County denies that it should share the proceeds of the Capital Outlay Notes, which were issued for educational purposes and declares that summary judgment is inappropriate. Bradley County claims that the Notes were issued pursuant to the Local Government Public Obligations Act,[11] which does not require a sharing of the proceeds.

---

[11]T.C.A. 29-21-101, *et seq.*

18

Its argument is predicated upon three cases: (1) <u>Guffee v. Crockett</u>, 315 S.W.2d 646 (Tenn. 1958); (2) <u>Board of Education of Memphis City Schools v. Shelby County</u>, 207 Tenn. 330, 339 S.W.2d 569 (1960); and, (3) <u>Phillips v. Anderson County, Tennessee</u>, 698 S.W.2d 76 (Tenn.App. 1985).

Bradley County avers that the trial court's reliance upon Guffee was misplaced in that it only dealt with an intra-statutory interpretation of what was T.C.A. 49-701 (now T.C.A. 49-3-1001, *et seq.*) dealing with the issuance of school bonds. Rather, it argues that the issue before us is the inter-statutory interpretation between two separate statutes - the Local Government Public Obligation Act[12] and the School Bond Act.[13]

<u>Guffee</u> was decided in 1958 prior to the adoption of the Local Government Public Obligation Act in 1986. Moreover, <u>Board of Education of Memphis City Schools</u> and <u>Phillips</u> were also decided before the adoption of the Local Government Public Obligation Act. Therefore, the court in those cases did not take the School Bond Act into consideration in its determination on any of the cases.

We find that there is no conflict between the Local Government Public Obligation Act of 1986 and the School Bond Act and the cases cited by the parties.

D. THE ATTORNEY GENERAL'S OPINIONS

---

[12]T.C.A. 9-21-101, et seq.

[13]T.C.A. 49-3-1001, et seq.

Lastly, Bradley County argues that the Attorney General's Opinions should carry great weight with this Court and that we should find that Bradley County has no obligation to share the Notes proceeds with the City. In <u>Washington County Board of Education</u>, 693 S.W.2d at 348, Justice Drowota, addressed the issue of an opinion by the Attorney General to the effect:

> It appears that the present lawsuit was precipitated in part by an opinion of the Attorney General for the State of Tennessee that concluded that the Washington County Board of Education was without the necessary authority to enter into the contract with MarketAmerica. That opinion, dated February 25, 1983, relied solely upon this Court's decision in *Brown* and previous opinions of the Attorney General. The Attorney General observed that the duration of the contract and the provision requiring documentation that future boards would be bound were the principal deficiencies of the contract. Although opinions of the Attorney General are useful in advising parties as to a recommended course of action and to avoid litigation, they are not binding authority for legal conclusions, and courts are not required or obliged to follow them.

On this point, we find Judge John B. Hagler's Memorandum Opinion in the *City of Sweetwater v. Monroe County*, an excellent review of the Attorney General's Opinions, and directly to the point in this matter. Judge Hagler stated:

> In arguing that the pro rata standard does not apply to a "loan," Monroe County relies primarily, and reasonably, on a series of Attorney General Opinions going back to 1980. In 1980, the Attorney General opined that the proceeds of capital outlay notes (issued under T.C.A. 5-10-105, et seq., repealed in 1988) need not be prorated even though all taxable property in a county was subject to a tax to retire the notes. Op. Atty. Gen. No. 80-290 (June 10, 1980). Relying upon this opinion, the Attorney General in 1988 opined that "general obligation bonds" issued pursuant to the "Local Government Public Obligations Act of 1986 (T.C.A. 9-21-101, et seq.) Which superseded all earlier statutes dealing with bonds and notes, are not subject to the mandated proration of T.C.A. 49-3-1003. Op. Atty. Gen. No. 88-110 (June 2, 1988). Likewise, relying on his 1980 and 1988 opinions, the Attorney General opined in 1989 and 1993 that the proceeds of capital outlay notes also issued under the new 1986

20

statute did not have to be shared. Op. Atty. Gen. No. U89-19 (March 10, 1989); U03-09 (February 2, 1993).

Although opinions of the Attorney General do not carry the weight of court opinions, they must be accorded great consideration not only because of the expertise that office develops in advising state and local governments but also because of the reliance upon these opinions by governmental authorities.

Nevertheless, the Court is forced to conclude that, while the 1980 opinion, dealing with certain specific language in the then-current "capital outlay notes" statute, may have been correct, the subsequent opinions in 1988, 1989, and 1993 are incorrect.

A short analysis of these opinions is necessary to show that the Attorney General failed, after the 1980 opinion, to take account of specific language in the 1986 statute. The Attorney General in 1980, while recognizing the authority previously cited here, was impressed by the following language in T.C.A. 5-10-501(s)(7), which, at that time, governed the issuance of capital outlay notes:

> "The provisions of clause 'one' of the first Paragraph and the provisions of the second paragraph of this section (which related to school funding) shall be <u>in addition to and supplemental to</u> all other provisions of other laws of the State of Tennessee, <u>provided that whenever the application of these provisions conflicts with the application of such other provisions</u>, these provisions shall prevail."

Emphasis added. This special language convinced the Attorney General that this "separate authority" for the issuance of capital outlay notes was not subject to the requirement for allotting a portion of the note proceeds to municipal or special school districts even though the taxable property within such districts were subject to the county's taxing power. Op. Atty. Gen. No. 80-290. The Attorney General acknowledged that this "creates risk" of double taxation within the school districts but noted that double taxation itself is not unconstitutional where it is "plain that the legislature intended such result." <u>Id.</u>

However, the unreported Court of Appeals' decision,[14] which resulted when the parties to whom the Attorney General rendered the opinion brought an action for Declaratory Judgment, declined to follow the Attorney General's analysis. Although finding proration unnecessary with respect to capital outlay notes, the court reached this conclusion only by striking down that portion of the county's resolution pledging a levy on all taxable property in the county. The Court was of the opinion that the statute, which authorized the issue of capital outlay notes prohibited the county from levying ad valorem taxes for the

---

[14]<u>The Board of Trustees of the Trenton Special School District v. The Gibson County Legislative Board, et al.</u>, Ct. App. Western Section, December 4, 1981, TAM 7/5-10.

21

payment of such notes.[15] The upshot is that the court left undisturbed the principle that pro rata allocation is necessary whenever there is a pledge to levy on <u>all</u> taxable property in the county.

Following the 1980 opinion, the Attorney General opined in 1988, 1989, and 1993 that the proceeds of general obligation bonds and capital outlay notes, issued under the new Local Government Public Obligations Act of 1986, T.C.A. 9-21-101 et seq., are not subject to the pro rata distribution requirements of T.C.A. 49-23-1003. The Attorney General found, in each of the three opinions, that no provision of the new Act requires *pro rata* distribution among school systems within a county and that T.C.A. 9-21-124, like the earlier statute he construed in 1980, provides that if the "provisions of this law conflict with any other provisions of law or are inconsistent with any other provisions of law, the provisions of this chapter shall prevail with respect to all bonds and notes issued under this chapter."

Unfortunately, the Attorney General in each of these later opinions overlooked another provision in the Local government Public Obligations Act of 1986 which was not in the "old capital outlay notes" statute:

> 9-21-107. Powers of Local Governments./All local governments have the power . . .to:
>
> ******************************************
>
> (4) pledge the full faith, credit and unlimited taxing power of the local government as to all taxable property in the local government <u>or a portion of the local government, if applicable</u>, to the punctual payment of the principal of and interest on the bonds or notes issues to finance any public works project. . .
>
> ******************************************
>
> (5) in the case of a county or metropolitan government <u>which contains within its boundaries a special school district and/or incorporated city or town maintaining a public school system separate from the county or metropolitan government public school system</u>, the tax pledge authorized by subdivision (4), when pledged to the payment of bonds or notes issued to finance the construction of public schools of the county or metropolitan government serving outside the territorial limits of such special school district and/or incorporated city or town, <u>may be a pledge of taxes to be</u> levied only upon taxable property within that portion of the county or metropolitan government lying

---

[15]It is possible the court misread this prohibition as applying to capital outlay notes when, in fact, it appears to have applied only to "grant anticipation notes." T.C.A. § 5-10-501(b)(6). Or, perhaps this court is missing some link in the legislative chain.

> outside the territorial limited of such
> special school district and/or incorporated
> city or town. . ."

> There could not be a clearer statement of the
> legislative intent that the only way to avoid
> proration, as required by T.C.A. 49-3-1003, is a pledge
> of taxes to be levied only upon taxable property within
> that portion of the county lying outside the
> territorial limits of a city.  Therefore, there is
> no"conflict," as existed with the earlier statute,
> between the statute relating to general public
> obligations and the statute relating to school
> financing, and reading them in pari materia, the result
> is that the proceeds of general obligation bonds,
> capital outlay notes, and all other bonds and notes are
> considered "school bonds" and are subject to the
> proration mandate of T.C.A. 49-3-1003.

We affirm the decision of the Chancellor in respect to the decision requiring Bradley County to share the proceeds of the Notes with the City.

## V. CONCLUSION

There being no dispute as to any material fact in this matter, the Trial Court correctly granted Bradley County's motion for summary judgment on the declaratory judgment portion of the Complaint and correctly granted the City's motion for summary judgment on the money debt.  For the reasons stated above, the judgment of the Trial Court is affirmed and the cause remanded for collection of costs below.  Costs of this appeal are adjudged equally against the parties and their sureties.


_____
Houston M. Goddard, P.J.



CONCUR:




_____
Herschel P. Franks, J.

23

_____(Not Participating)_____
Don T. McMurray, J.