MAYOR AND CITY COUNCIL OF NASHVILLE, in error,
*v.* MARGARET HAGAN, Adm'x.

1. LIABILITY OF MUNICIPAL CORPORATION. *Power of Committee to bind corporation. Water-works. Improvement.* The power to make a contract for the introduction of a new and expensive improvement in a system of water-works, being equivalent in general to the power to levy, collect and disburse taxes, must be exercised in the same manner and by the same authority, that is, by a corporate act. There being no general law or ordinance modifying this rule, a water-works committee had no power to bind a corporation by a contract of this character.

2. SAME. *Same. Ratification of contract by city government.* The court below instructed the jury that the failure of the city authorities within a reasonable time to disaffirm what the committee had done, would be a ratification; and refused to charge, that the ratification could only be by the action of the two boards of Aldermen and Councilmen approved by the mayor, and that the mayor and members could not commit or estop the city by any conduct or expressions of the water-works: *Held*, error.

Case cited : The State *v.* Ward & Briggs.  9 Heisk., 100.

3. SAME. *Use of machine. Patent right.* The use of a patent machine does not necessarily imply, in the absence of a contract, that the patent is to be paid for.

## FROM DAVIDSON.

No record can be found.

MCFARLAND, J., delivered the opinion of the court.

This action was brought by John C. Hagan against the mayor and city council of Nashville. The declaration avers in substance that the plaintiff was the

inventor and exclusive owner of a new and useful machine for supplying cities and towns with water, and for extinguishing fires. That in 1869 he had filed his *caveat* in the patent office, and after the contract with the defendant he obtained letters patent. That after he had filed his *caveat* he entered into a contract with the defendant, by which he agreed to permit its officers and agents to have said machine manufactured, and put in operation under his (the plaintiff's) supervision, and to use and employ the same to supply the city of Nashville with water for the use of its citizens, and for the extinguishment of fires; and in consideration thereof the defendant promised and agreed that if upon trial the machine should be found capable of raising water to such a hight as the power of. the engine at the water-works was capable of affording, and the strength of the pipes through the city was capable of resisting, it would pay the expense of manufacturing the machine, and, in addition, such reasonable compensation to the plaintiff as the use of said machine for supplying water, etc., was reasonably worth; and it is averred that the machine was accordingly manufactured and used by the city, and upon trial was found capable of raising water as high as the capacity of the engine and strength of the pipes would allow, and the city thereby became liable to pay the plaintiff what the use of said machine was reasonably worth, which is averred to be $50,000.

There is also a common count for work and labor done, materials furnished and goods and wares sold, etc.

The defendant pleaded a general denial of its promise and undertaking, and also that it had complied with all its covenants made with the plaintiff in respect to the matter alleged. Upon trial, there was verdict and judgment in favor of the plaintiff for $12,000. A new trial being refused, the city took a bill of exceptions and appealed in error to this court, and numerous errors have been asssigned in argument as grounds for a reversal. There was no evidence that a formal contract was entered into between the plaintiff and the city authorities acting in a corporate capacity, or that any action was taken by either of the two boards constituting the city government, authorizing such contract, or having reference thereto. The plaintiffs introduced H. D. Grant and several other witnesses, by whom it was proven, in substance, that Grant was chairman of one of the standing committees known as the water works committee. That as such it became his duty to investigate the condition of the existing water works and the supply of water. Under the system then existing, the city was supplied by means of a reservoir, into which the water was forced from the river by pumps driven by steam, and from the reservoir the water was carried through pipes into the city by weight and pressure of the water in the reservoir. Grant found that this syster failed to supply certain high places in the city, and, in cases of fires, the supply of water was not sufficient in other places. Grant regarded it as his duty to devise some plan to remedy the defect. Several plans were proposed, discussed and rejected.

VOL. 9.—32

Mayor and City Council *v.* Hagan.

The plaintiff then presented his plan and satisfied Grant that it would be successful. He says, "consequently I recommended it to the mayor and city council, and secured an appropriation necessary for its construction. The understanding with the committee and mayor and city council was, that Hagan should be paid what his machine was worth, should it prove a success."

In explanation of this, which appears in the deposition of Grant, read by the plaintiff, the defendant read another informal deposition or affidavit given by Grant previously, in which he says: "The understanding with the mayor and a large majority of the members of both boads, *with whom I frequently talked about this matter*, was always clear and distinct, that that or any succeeding administration would do you (meaning Hagan) the justice to allow you what your machine was worth if you made it a success."

There was a large mass of other testimony, but nothing more definite as to the contract. There is proof that the other members of the committee assented to the action of Grant; but their understanding as to what was to be paid to Hagan was very indefinite. It fully appears that the machinery, constituting Hagan's improvement, was manufactured under a contract entered into between Grant, chairman of the water works committee, on behalf of the city, and J. M. Brennan & Bro., the manufacturers, under the supervision of Hagan, and that the price agreed upon was paid to the manufacturers by the city authorities.

Without attempting an accurate description of Ha-
gan's improvement, it is sufficient to say, that it con-
sisted of a large pipe laid down across the bottom of
the reservoir, connecting directly the supply pipe from
the pumps with the main pipe leading into the city,
and into this was inserted certain valves, stand-pipe
and air-chamber; the result of which, it was claimed,
would be, when occasion required, to force the water
directly from the pumps into the pipes leading through
the city, and that this system would convey the
water as high as the force of the engine and the
strength of the pipes would allow; when there should
be an excess of water over the supply demanded it
would escape into the reservoir.   The engine pumps,
pipes and reservoir, and, in fact, everything, except
the improvement above mentioned, were the same
owned and used by the city under the old system.
The improvement of Hagan was put down and a
time fixed to test it; and the mayor, city council
and citizens invited to test, some of whom were pres-
ent and pronounced themselves satisfied with the im-
provement, and declared the improvement a success;
and the proof shows that the flow of water was
greatly increased in those portions of the city where
there had been a deficiency.   No action, however, was
taken by the corporate authorities.   Soon after there
was a change of officers in the administration of the
city government, and upon the new engineer coming
in charge removed certain portions of the fixtures of
Hagan's improvement.   That is, as we understand, he
removed the safety-valve—what is called the butterfly-

valve—and air chamber, but retained the main pipe and stand-pipe." It is claimed by the plaintiff, that the city is still in use of the material portions of his improvement; while for the defendant it is insisted, that the *combination*, covered by the plaintiff's patent, has been abandoned, and that the city had simply adopted a new combination, embracing parts of the plaintiff's combination, which were not in themselves *new* or covered by his patent, and is now using this new system. This is one of the controverted questions.

It is claimed for the defendant that it was necessary to abandon Hagan's combination, because the pumps and machinery were being badly injured by the excessive pressure. It was also claimed that Hagan had himself removed some parts of the fixtures to his improvement, and forbade their use, alleging that the city had refused to pay him. It was also alleged that the officers in charge proposed to allow Hagan to remove any of his machinery he claimed; but these were not controverted questions. This outline of the case will suffice to present the questions of law involved.

The first question was whether the water works committee had the power to bind the city government, by a contract of this character. We think unquestionably it had not. The power to make a contract of this character, for the introduction of a new and expensive improvement, is equivalent in its character to the power to levy, collect and disburse taxes, inasmuch as, if the contract be valid, it must be com-

plied with, and the price agreed to be paid must be raised by taxation, and paid out under the appropriations of the proper city government. The power to make such a contract, being equivalent in general to the power to levy and disburse taxes, must be exercised in the same manner and by the same authority, that is, by a corporate act. The city government may, by general laws and ordinances, modify this rule and give to the committees power to make contracts in some instances. Under the ordinances passed by the city government and read on the trial, it is expressly provided that the standing committees may recommend improvements involving the expenditure of money, but no money shall be paid out except under authority of the city council; or under existing laws; "Provided that the water works committee shall not be prevented in case of *emergency* from making all necessary expenditures to keep the water works in good repair and condition, and in active operation." It is clear, however, as we think, that this proviso gave no power to the water works committee to bind the city by contract for the introduction of a new system of water works, involving an expenditure of several thousand dollars. The power was, in case of *emergency*, to make expenditures to keep the existing water works in repair and in operation; but this was the introduction of a new system in part, involving a large expenditure. There was ample time, from its nature, to refer the matter to the council and it was therefore not a case of emergency.

The circuit judge was requested by the defendant's

counsel to instruct the jury that the water works com-
mittee could bind the city by contract, only in case
of emergency in the sense of the ordinance read;
and emergency meant something pressing and not ad-
mitting of such delay as would suffice to bring the
matter before the council. This the court declined, but
said that any contract the committee made for the
purpose of supplying the city with water would be
valid *prima facie,* as the committee were to judge of
the necessity; that it might be shown, however, that
they had transcended their power. How this was to
be shown was not explained. As we have intimated,
we think this was error. The jury should have been
told that the committee could only contract for ex-
penditures in case of emergency, for the purpose of
keeping the water works in repair and in operation.
That this did not give them the power to contract
for the introduction of a new system involving a
large expenditure. That this, from its very nature,
was a matter to be referred to the city council.
But this instruction and refusal of the defendant's re-
quest would not, of itself perhaps, be of so vital im-
portance, for the reason that the judge in the charge
did, in substance, tell the jury, that the committee
had not the power to make the contract. He said:
"If the proof does not show that the plaintiff had
made the specific contract with the city council, but
made it with the water works committee, and the
proof shows that after the test was made and the
water works committee expressed themselves satisfied
with the result, it would then be necessary, in order

to make it binding on the corporation, that the mayor and city council should take some action upon the matter, and either reject or affirm it." He continues, however, "but if the proof should fail to show that there was any action by the mayor and city council disaffirming or affirming the contract, and it should appear that the mayor and city council had the knowledge of all the material facts in relation to the contract, and of the test of its results, and failed within a reasonable time to disaffirm what the committee had done in the matter, the court instructs you that this would be a ratification of the contract upon the part of the mayor and city council." In this connection his honor was asked to instruct the jury, that the ratification could only be by the action of the the two boards of aldermen and councilmen, approved by the mayor; and that the mayor and members of the council could not commit or estop the city by any conduct or expressions of theirs at the water works at any time. These instructions were refused. We hold that in the latter clause of the charge above given, and in the refusal his honor was in error.

We do not say that a ratification may not arise from the *corporate acts* of a city government which are inconsistent with any other supposition, although the contract was without authority and although there was no direct vote of ratification. This is illustrated by the case of *Paterson* v. *The Mayor and Council of New York*, 13 New York Court of Appeals, relied upon by plaintiff's counsel. In that case it apeared that the committee on markets had referred to them the sub-

ject of rebuilding the Washington market. One of the committee employed the plaintiff to draw very elaborate plans of the proposed buildings. The plans were afterwards adopted by the proper city authorities in due form, and the building ordered to be erected. This was held to amount to a ratification. It was conceded that the contract was without authority, that it would require a legislative act to make or ratify the contract. It will be observed that the ratification resulted from the action of the authority in adopting the. plans of the plaintiff and taking the necessary steps to erect the building; but this was a corporate act, passed in due form by both chambers of the city government, as other ordinances or legislative acts were adopted. We think no well considered cases can be found holding that a contract of this character, which could only be made in the first instance by the act of the city authorities in their corporate capacity, can be ratified by the failure to take formal action repudiating the contract, notwithstanding members of the city council have knowledge of the facts. In the case of *The State* v. *Ward & Briggs*, before this court at December term, 1871, one of the questions was, whether certain portions of a contract for leasing or hiring out the convict labor of the penitentiary, in which the commissioners upon the part of the State had exceeded their authority, had been ratified by the Legislature. It was held, that as the commissioners acted under an act of the Legislature, that the ratification must have been by a legislative act. Chief Justice Nicholson, delivering the opinion of the court,

said: "It is not enough that the individual members of the Legislature should have had knowledge of the existence of the illegal stipulations in the contract, and should acquiesce passively therein; but to amount to a ratification, they must take some definite action as an organized Legislature, either expressly recognizing and adopting the illegal stipulations, or some definite action as a Legislature, from which an intention to ratify them may be fairly inferred." In support of this Judge Nicholson refers to 18 Maryland R., 282; and 20 Maryland R., 14; in which cases it was held that the ratification of unauthorized acts by municipal corporations must be by corporate acts; and to 16 California, 23, in which it is said: "To ratify is to give validity to the act of another. A ratification is equivalent to a previous authority, it operates upon the act ratified in the same manner as though the authority had been originally given." "It follows," continues the authority, "as a consequence, that where the authority can be originally conferred only in a particular form, the ratification must follow the same form or mode; . . . where an authority to do any particular act upon the part of a corporation can only be conferred by ordinance, a ratification of such act can only be by ordinance." Judge Nicholson adds, that "the reasons on which the rule rests, as to a corporation, apply with equal force to a Legislature, the corporation being in this repect a *quasi* Legislature."

It is argued, however, for the plaintiff, that, even conceding this error, the judgment should not be

reversed, because it is said the verdict was proper under the common count; but we cannot determine under which count the jury rendered their verdict, and cannot say that the error may not have prejudiced the defendant; and besides we will not now undertake to say, that the verdict was proper under the common count. We are referred to the case of the *Gas Company* v. *San Francisco,* 9 California. In that case it appeared that the gas company had furnished gas to the city under a contract, for which judgment was rendered without objection; and that, without any contract, the company furnished the city with gas, in addition, to light the city hall and engine houses for nearly two years; the bills, amounting to over $10,000, were rendered monthly to the common council, and a portion of them audited and allowed, but not paid; that the gas was used nightly in the chambers of the common council during its sittings, in the office of the mayor, comptroller, treasurer police officers, etc. The case was decided in favor of the right to recover, upon the ground that under the California statute the answer to the complaint was insufficient.

In the opinion of Judge Field, however, there are remarks which, although *obiter,* we are not disposed to controvert. He says: "The respondent denies the right, upon the sole ground that there was no evidence of any ordinance of the common council authorizing the furnishing of the gas. The proposition of the defendant is that a municipal corporation can incur no liability otherwise than by ordinance. The position to its full extent is not tenable; under

some circumstances a municipal corporation may become liable by implication; the obligation to do justice rests equally upon it as upon an individual. It cannot avail itself of the property or labor of a party, and screen itself from responsibility under the plea that it never passed an ordinance on the subject. As against an individual, the law implies a promise to pay, and the implication extends equally to corporations."

He further says that where the contract is executory the corporation cannot be bound unless made in pursuance of provisions of its charter; but where the contract is executed, and the corporation has enjoyed the benefit of the consideration, an assumpsit will be implied. It will be presumed, for the purpose of justice, that authority was properly delegated to the officers, or that their acts were ratified;" conceding that these remarks were proper as applicable to a case like the one then before the court, and not deciding whether it be in conflict with the opinion of this court in the case of Ward & Briggs, they certainly do no apply with the same force to the present case. Where property is delivered and used, as in that case, the clear and necessary inference, as well as the natural sense of justice, would be that it was to be paid for; but here the property itself, that is, the machinery was paid for by the city. The plaintiff does not sue for his labor in superintending the building, but for the value of his right patented. While the delivery and use of property would ordinarily raise an inplication that it was to be paid for, the use by the defendant

of a machine for which it had paid, would not necessarily raise an implication that it was to pay for the patent right. The plaintiff might, in such cases, permit tho building and use of such patented machine by the defendant at its own expense, as a means of testing an untried improvement and advertising it to others; whether in such cases the patentee is to have pay for his patent would depend upon his contract. If he should permit an individual to build, at his own expense, and use such patented machine, without any contract that he was to have pay for the patented right, he would be without remedy, and the same rule would apply to a corporation.

Whether there might be in such cases grounds for a court of equity enjoining the use of such machine, where the permission was given under a misapprehension or the belief that the contract for pay was valid, we need not decide. We only hold that the use of such patented machine does not necessarily imply, in the absence of a contract, that the right is to be paid for; and we, of course, do not decide that the improvement that the defendant continued to use, is in substance the improvement covered by the plaintiff's patent.

The judgment must be reversed and a new trial granted.