
IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 23, 2017 Session

## GEORGE M. GREENWOOD, ET AL. V. CITY OF LEBANON, TENNESSEE

**Appeal from the Chancery Court for Wilson County**
**No. 2014-CV-183     Charles K. Smith, Chancellor**

_____

### No. M2016-01168-COA-R3-CV

_____

The plaintiffs entered into a contract signed by the commissioner of finance for the City of Lebanon to act as the City's insurance broker for health care benefits. The plaintiffs secured a group health care benefit contract for the City for the period from July 1, 2013 through July 1, 2014. In February 2014, the City informed the plaintiffs that it had appointed another broker and refused to pay the monthly service fees for the remaining months of the contract. The City asserted that the contract was *ultra vires* because it was not signed by the mayor or approved by ordinance enacted by the city council as required by the City's charter. The trial court found the contract to be *ultra vires*, but determined that the City "should be equitably estopped from denying the validity of the agreement" and granted summary judgment in favor of the plaintiffs. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

Phillip Andrew Wright, Jr., Lebanon, Tennessee, for the appellant, City of Lebanon, Tennessee.

Joe M. Haynes, Goodlettsville, Tennessee, for the appellees, George M. Greenwood and Janet Langley.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

The City of Lebanon ("the City") is a municipal corporation of the State of Tennessee, chartered pursuant to chapter 644 of the Tennessee Private Acts of 1911, as

amended through 2016. Article II, section 1 of the charter provides that the City shall have numerous powers "by ordinance," including the power "to make contracts" and "to expend the money of the City for all lawful purposes." 2016 TENN. PRIV. ACTS ch. 52, § 3. The City has the authority to provide health insurance for its employees. Charter, art. II, § 3, 1953 TENN. PRIV. ACTS ch. 414. Pursuant to article III, section 1 of the charter, the City's governing body, the city council ("the Council"), consists of a mayor and one alderman from each ward of the City. 1929 TENN. PRIV. ACTS ch. 685, as amended. The Council "shall, by resolution, have the power to approve all contracts and agreements that would legally bind the City in some manner." Charter, art. III, § 5, 2016 TENN. PRIV. ACTS ch. 52, § 4. The mayor is the "chief executive officer of the City" and "shall execute all deeds, bonds, and contracts made in the name of the City as approved by the City Council." Charter, art. V, § 1, 2016 TENN. PRIV. ACTS ch. 52, § 7. The commissioner of finance and revenue is to attest the mayor's signature. *Id.*

George M. Greenwood filed suit against the City on May 7, 2014 for breach of contract. Mr. Greenwood alleged that he entered into an employment contract with the City on May 9, 2003 and a substantially similar employment contract[1] on June 14, 2013. According to Mr. Greenwood, these contracts were approved by the Council and signed by the commissioner of finance.[2] Pursuant to the terms of these contracts, copies of which are attached to the complaint, Mr. Greenwood was named the agent of record (May 2003) or broker/service provider of record (June 2013) for purposes of employee benefits. Because this lawsuit seeks to recover under the June 2013 contract, we will focus on the terms of that agreement. As broker/service provider ("Broker"), Mr. Greenwood was to provide the following services:

1.  Review the rate renewal information received from the current carrier on behalf of the Customer Account [the City].
2.  Create an analysis of the current plan and renewal premium vs. current premium.
3.  Negotiate the very best premium rates and/or benefits on behalf of the Customer Account.
4.  Seek proposals from other insurance companies when it meets the needs of the Customer Account by providing the maximum benefits and features at the lowest cost.
5.  Prepare a spread sheet comparing the benefits, features and cost of other options.
6.  Recommend to the Customer Account as to employee benefits which in the opinion of the Broker/Service Provider shall be in the best interest of the Customer Account and the Customer [Account's] employees.

---

[1] According to the complaint, the June 14, 2013 contract "only updated the terminology and did not vary the terms or respective responsibilities of the parties."

[2] Neither contract was signed by the mayor, as required by the charter.

7. Assist the Customer Account on an ongoing basis with employee benefits.
8. Keep Customer Account updated with information on new employee benefits which the Broker/Service Provider may become aware of.
9. Will repeat these services each year to make sure the Customer Account is always getting the best coverage at the best cost.

The contract further states that termination of the agreement "shall in no way impair this Broker/Service Provider's rights to all service fees and renewal service fees for the remainder of the current contract year for and on business placed by the Broker/Service Provider of record and is hereafter considered earned as Broker/Service Provider of Record." The Broker agrees to "accept a service fee of 3.5% of medical premiums billed by the insurance company as payment for services."

The complaint alleges that, on February 5, 2014, the City's commissioner of finance sent Mr. Greenwood a letter stating that it had approved the appointment of a new broker for health insurance. The City refused to pay Mr. Greenwood his monthly service fees from February 5, 2014 through July 1, 2014, the end of the contract year. Mr. Greenwood asserts that the City's refusal to pay him amounts owed under the terms of the agreement constitutes a breach of contract. On October 13, 2014, Mr. Greenwood was permitted, by agreed order, to amend his complaint to add Janet Langley as a plaintiff. The amended complaint states that the plaintiffs secured group health benefits for the City's employees from United HealthCare Services, Inc. ("UHC") and that Mr. Greenwood and Ms. Langley executed a billing and collection agreement with the City. The billing and collection agreement provides that the City would collect a 3.5% service fee from UHC, which would be paid to the plaintiffs: 75% to Mr. Greenwood and 25% to Ms. Langley.

In its answer to the amended complaint, the City denied the existence of a valid contract between the parties or any breach of such agreement. Citing its charter, the City stated that any contract had to be approved by ordinance enacted by the Council and that the Council had never approved any contract between the City and Mr. Greenwood. Furthermore, the City alleged that, contrary to the requirements of the charter, the mayor had not signed the contract. Thus, the City asserted, any alleged contract would be *ultra vires*. Citing the principle that a person contracting with officers of a municipal corporation is deemed to be on notice of the authority of such officers to contract on behalf of a city, the City further stated that the plaintiffs failed to establish they exercised due diligence to insure that the alleged contracts were enforceable. The City requested that the amended complaint be dismissed.

In April 2015, the plaintiffs moved for partial summary judgment with respect to liability. In support of this motion, the plaintiffs filed a statement of undisputed material facts, the affidavit of Mr. Greenwood, the affidavit of Ms. Langley, and the affidavit of

Don Fox, mayor of Lebanon from January 1994 through December 2008. The City moved to strike the plaintiffs' affidavits on the grounds that they were not based on personal knowledge, set forth facts not admissible at trial, and did not establish that the plaintiffs were competent to testify to the matters addressed in their affidavits. The City opposed the plaintiffs' motion for summary judgment and filed a cross-motion for summary judgment on the ground that there were no genuine issues of material fact in dispute and the City was entitled to judgment as a matter of law. In support of its motion for summary judgment, the City responded to the plaintiffs' statement of undisputed material facts and submitted its own statement of additional material facts. In July 2015, the plaintiffs filed amended affidavits of Mr. Greenwood and Ms. Langley and opposed the City's motion to strike and motion for summary judgment. According to the City's brief, the trial court orally denied the plaintiffs' motion for partial summary judgment and the City's motion to strike and motion for summary judgment at a hearing on July 10, 2015. There is nothing in the record on appeal to reflect the trial court's rulings.

In February 2016, the plaintiffs filed another motion for summary judgment based on their amended affidavits, an affidavit of Nick Arnold (an executive at UHC), and an amended statement of undisputed material facts, as well as requests for admissions submitted to the City to which the City had failed to respond. The plaintiffs asserted that these requests for admissions should be deemed admitted. The City opposed the motion.

The plaintiffs' motion for summary judgment was heard by the court on March 23, 2016. The court accepted the affidavits relied upon by the plaintiffs. The court further determined:

> 3. The Plaintiffs produced evidence that the June 4th, 2013, service provider agreement upon which they rely was a valid contract that existed between the Plaintiffs and the Defendant.
> 4. The service provider was a valid contract as the Mayor at that time, Don Fox, had the authority to direct the Finance Commissioner at that time, Russell Lee, to sign the service provider agreement and bind the Defendant City of Lebanon to it.
> 5. Mr. Lee, as the City of Lebanon Finance Commissioner, was a part of the City and had the authority to sign the service provider agreement and bind the City of Lebanon to it.
> 6. The service provider agreement was not an executory contract and was completed by the Plaintiffs by simply brokering the agreement between the Defendant and its employees' healthcare carrier, United Healthcare Services. The Plaintiffs had no other or ongoing obligations under the service provider agreement.
> 7. The City had the power to adopt such an agreement with the Plaintiffs, but the evidence establishes that the Lebanon City Council did not pass an ordinance approving the June 4, 2013, service provider agreement with the

Plaintiffs nor did the passage of that fiscal year's budget ordinance approve the service provider agreement. Therefore the service provider agreement was *ultra vires*.[3]

8. However, regardless of the service provider agreement being *ultra vires*, the Defendant should be equitably estopped from denying the validity of the agreement because there was mutual assent, mutual agreement, and the Defendant City of Lebanon received and accepted the benefits provided by the Plaintiffs under the service provider agreement, and therefore would be unjustly enriched by retaining the benefit without properly compensating the Plaintiffs.

9. Although the Defendant provided proper notice to the Plaintiffs to terminate the service provider agreement, under the terms of the agreement, the Plaintiffs were due the full amount of the service provider brokerage fees the moment Finance Commissioner Russell Lee signed the service provider agreement.

10. The doctrines of *quasi-contract* and *equitable estoppel* require equity to rule in this matter and the Defendant should be bound by the actions of the Finance Commissioner, Russell Lee.

Relying on the affidavit of Mr. Arnold to determine the amount of service fees due, the court entered judgment in the amount of $64,724.55 plus interest.

On appeal, the City raises the following issues: (1) whether the trial court erred in denying the City's cross-motion for summary judgment; (2) whether the trial court erred in denying the City's motion to strike the affidavits submitted by the plaintiffs in support of their motion for partial summary judgment; and (3) whether, in granting the plaintiffs' second motion for summary judgment, the trial court erred in applying the doctrines of quasi-contract and equitable estoppel and in disregarding genuine issues of material fact.

ANALYSIS

City's Cross-Motion for Summary Judgment

The City argues that the trial court erred in denying its cross-motion for summary judgment. According to the City's appellate brief, the trial court made an oral ruling denying this motion at a hearing on July 10, 2015. The record on appeal, however, contains no order setting forth the trial court's ruling on the City's cross-motion for summary judgment. The record also contains no transcript or statement of the evidence from this hearing.

---

[3] *Ultra vires* is defined as "[u]nauthorized; beyond the scope of power allowed or granted by a corporate charter or by law." BLACK'S LAW DICTIONARY (10th ed. 2014).

- 5 -

Pursuant to Tenn. R. App. P. 13(c), we may consider only those facts "set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to rule 14 [regarding post-judgment facts]." In the present case, as neither judicial notice nor post-judgment facts apply, we must consider only those facts that appear in the record on appeal. The absence of an order regarding the trial court's disposition of the City's cross-motion precludes our review of this issue. *See Chapman v. Wellmont Holston Valley Med. Ctr.*, No. E2012-01163-COA-R3-CV, 2012 WL 6651345, at *2 (Tenn. Ct. App. Dec. 21, 2012) ("The lack of an order in the record with regard to the Trial Court's disposition of motion in limine number 5 is fatal to the issue raised by Plaintiffs on appeal. This Court will not assume that the Trial Court granted a motion without some proof in the record thereof.").

## City's Motion to Strike Affidavits

The City also argues that the trial court erred in denying its motion to strike the affidavits submitted by the plaintiffs in support of their motion for partial summary judgment. This argument must fail for the same reasons outlined above regarding the City's cross-motion for summary judgment: the trial court did not enter a written order setting forth its decision on the City's motion to strike.[4] Thus, we cannot review this issue.

## Equitable Estoppel

The City's final argument is that, in granting the plaintiffs' motion for summary judgment, the trial court erred in applying the doctrine of equitable estoppel and in disregarding genuine issues of material fact.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. The moving party has the burden of persuading the court that no genuine issues of material fact exist and that it is entitled to a judgment as a matter of law. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). If the moving party satisfies its burden, then the nonmoving party must demonstrate that there is a genuine, material factual dispute, or the motion for summary judgment will be granted. *Id.* A trial court decision on summary judgment presents a question of law, which we review de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Therefore, we must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.*

---

[4] The plaintiffs submitted revised affidavits in support of their subsequent motion for summary judgment, and the City did not file another motion to strike.

We are presented with the plaintiffs' motion for summary judgment in a breach of contract action. The City's charter requires that the mayor execute all City contracts and that such contracts be approved by ordinance. There is no dispute that the mayor did not sign the contract at issue and that the Council did not pass an ordinance approving the contract. Our Supreme Court has stated:

> When a municipality fails to act within its charter or under applicable statutory authority, the action is *ultra vires* and void or voidable. Under Tennessee law, a municipal action may be declared *ultra vires* for either of two reasons: (1) because the action was wholly outside the scope of the city's authority under its charter or a statute, or (2) because the action was not undertaken consistent with the mandatory provisions of its charter or a statute. Thus, the law recognizes a difference between the existence of a municipal power and the manner or mode of exercising municipal power legitimately.

*City of Lebanon v. Baird*, 756 S.W.2d 236, 241 (Tenn. 1988) (citations omitted); *see also Carter Cnty. v. Williams*, 190 S.W.2d 311, 315 (Tenn. Ct. App. 1945). If a municipality's act falls within the first category, the general rule is that equity cannot save the action. *Baird*, 756 S.W.2d at 242 n.2. As to the second category, principles of equitable estoppel may apply "[i]n some cases, if the City does an act that does not comply with the law controlling the manner in which it is to be done . . . ." *Id.* at 242 (citations omitted). In this case, the City of Lebanon had the power to enter into a valid service provider agreement with the plaintiffs but failed to comply with the requirements of the charter. Thus, we find that this contract fits within the second category of *ultra vires* contracts. *See Prof'l Eng'g Servs., Inc v. City of Red Boiling Springs*, No. M1999-00342-COA-R3-CV, 2000 WL 33281686, at *4 (Tenn. Ct. App. Apr. 26, 2000) (where contracts signed by mayor were not properly authorized by city council or approved by city attorney, second category of *ultra vires* applies); *Blue Cross-Blue Shield of Tenn. v. City of Lawrenceburg*, No. 01A01-9611-CV-00526, 1997 WL 195468, at *1-2 (Tenn. Ct. App. Apr. 23, 1997) (where city mayor and treasurer lacked authority to enter into binding agreements, second category of *ultra vires* applies); *Ailor v. City of Maynardville*, No. 03A01-9605-CV-00158, 1996 WL 722041, at *1-3 (Tenn. Ct. App. Dec. 17, 1996) (where city manager lacked authority to sign contract without the approval of the city commission, second category of *ultra vires* applies).

When a municipality has the power to do the act in question, but "the action was not undertaken consistent with the mandatory provisions of its charter or a statute," the municipality may be "estopped from denying the validity of its act for equitable considerations arising on the facts of the particular case." *Baird*, 756 S.W.2d at 241-42. The application of estoppel principles usually occurs "because the city has accepted the benefits of an act it induced another to perform, or because the city induced a detrimental act of another." *Id.* at 242 (citations omitted). In addition to the equities of a particular

case, the application of equitable estoppel "depends on whether the contract is executory[5] or partially or fully performed." *Id.* at 243. Tennessee's law of municipal corporations recognizes this distinction:

> As this Court noted in *Mayor and City Council of Nashville v. Hagan*, 68 Tenn. 495, 507 (1876); "where the contract is executory the corporation cannot be bound unless made in pursuance of provisions of its charter; but where the contract is executed, and the corporation has enjoyed benefit of the consideration, an assumpsit will be implied." . . . The clear corollary implied in this case is that had the contract been executory, the *ultra vires* nature of it would have precluded enforcement by equity because no enduring benefit had passed to the city or no detriment had been suffered by the other party to the contract.

*Id.* at 243-44.

Another accepted principle of municipal law is that, "'[p]ersons dealing with [municipal] officers are chargeable with notice of the powers which the corporation possesses, and are held responsible accordingly.'" *Id.* at 245 (quoting *Nashville v. Sutherland & Co.*, 21 S.W. 674, 676 (Tenn. 1893)). Yet, "a municipality will not be permitted to rely intentionally upon unauthorized acts or to take advantage of such acts to avoid its obligations or to work a fraud . . . upon an innocent party who has been induced by the corporation to rely upon an act and who has reasonably relied upon that act." *Id.* Deciding which of these two principles governs in a particular case requires the court to weigh the equities and to determine whether there has been unjust enrichment. *See id.*

In *City of Lebanon v. Baird*, 756 S.W.2d at 236, the defendant owned a large tract of residential property in the city and had it platted for future subdivision development. The city wanted to purchase the tract for a recreational park, and the city council adopted a resolution authorizing the mayor to purchase the property with funds obtained through a grant and from city funds. *Baird*, 756 S.W.2d at 238. The parties then entered into an option agreement under which the city paid the defendant $90,000 and had ninety days to exercise its option to purchase. *Id.* When a new administration came into office, the new mayor took no action to secure the state grant and the defendant was notified that the city council had voted to end negotiations to purchase his property. *Id.* at 239. The city demanded return of the $90,000 under the alternative theories that the contract was *ultra vires* (because the resolutions were not adopted with the formalities required of an ordinance under the city charter) or that the city acted in good faith in declining to exercise the option. *Id.* at 239-40.

---

[5] In the context of contracts, "executory" is defined as "[t]o be performed at a future time; yet to be completed." BLACK'S LAW DICTIONARY (10th ed. 2014).

The trial court found that the option contract was *ultra vires* and that "the City had acted in good faith when it determined that it could not afford to develop the Baird property as a park and that Defendant had sustained no damages to his property or business interests as a result of the City's actions." *Id.* at 240. The court ordered the defendant to reimburse the city the $90,000. *Id.* The Court of Appeals modified the judgment of the trial court. *Id.* Applying principles of implied contract based on the city's inducement of the defendant to enter into the contract, the Court of Appeals reduced the $90,000 judgment by the amount of the defendant's taxes, $48,000. *Id.*

The decision of the Court of Appeals was appealed to the Supreme Court, which reinstated the trial court's judgment with a slight modification (to subtract from the $90,000 award the defendant's legal fees for the drafting of the contract). *Id.* at 246. The Court reasoned that the contract was executory: "The City had not taken possession of the land; the deed had not been transferred." *Id.* at 245. Moreover, there was no evidence that "the City intended to take any advantage of the fact that the contract was not authorized." *Id.* The Court continued:

> On the contrary, in a timely fashion, within the 90 day period provided by the contract itself, the City determined that it could not afford to purchase the Defendant's property or to fund the park development and notified the Defendant of its decision. At the time the City approached the Defendant, the property was not for sale and whether Defendant would have attempted to sell it if the contract had not been executed is not apparent from this record. To the extent that the Defendant suffered any detriment as a result of the City's inducement to sell, he was required to expend $476.00 to prepare the contract, but the City's inducements did not alone cause Defendant to suffer an increased tax liability. The City notified Defendant well in advance of the time his 1978 tax return was due to be filed and suggested that he take precautions to protect his tax position when the $90,000 payment was reimbursed. Neither the Defendant nor the City took any timely action to resolve the continuing controversy between them. Defendant knew that the City had repudiated the contract and could have determined from an examination of the City Charter that the contract was not properly authorized by ordinance, but he failed to take action to resolve the dispute while he could still file an amended tax return. Failure to inquire into the authority of the City to make the contract before entering it does not weigh in Defendant's favor, but failure to make such an inquiry before relying upon it to his detriment cannot be seen as reasonable. The benefits to the City were minimal and temporary under the contract; the detriment suffered by the Defendant, in excess of the legal fees associated with entering the contract itself, was in substantial part due to his own dereliction. He failed to attempt to mitigate his damages while he could.

Moreover, Defendant received the benefit of using the $90,000 throughout the period of the dispute.

When the equities are weighed in the context of the facts of this case, we cannot say that Defendant did not share culpability with the City or that his reliance on the contract was reasonable in light of what he could have discovered about the City's authority and done to mitigate his damages. While we certainly do not condone the manner in which the City has dealt with Defendant, not only in its failure to authorize the contract but in failing to act in a timely manner to bring the dispute to final resolution, we do not believe that estoppel is appropriately applicable to this case, which involves an executory contract, except to the extent that Defendant spent legal fees in the preparation and execution of the contract itself.

*Id.* at 245-46.

By contrast, in *Trull v. City of Lobelville*, 554 S.W.2d 638, 642 (Tenn. Ct. App. 1976), the court determined that the city was estopped from denying a contract despite the fact that the contract was not formalized as required by law. The plaintiff in *Trull* agreed to construct a sewer line on the condition that he be allowed to tap on to the city's main line and charge tap-on fees to users on the new line and, once he had recovered his investment, convey the new line to the city. *Trull*, 554 S.W.2d at 639. The city allegedly reneged on its agreement. *Id.* The trial court found in favor of the plaintiff. *Id.* at 640. On appeal, the city argued that the city manager and commission lacked authority to contract without an ordinance passed at three official meetings and that the city did not ratify the agreements. *Id.* The Court of Appeals reasoned:

The evidence in the instant case . . . clearly shows the assent of the City authorities, including the City Council, and that the rights of the City are not prejudiced, hence, it does not appear just to allow a City to escape its obligation to one who has performed his part of a contract by asserting that it (the City) did not comply with the law in formalizing its action on the minutes of the Council.

Even if such unjust defense should be allowable, the circumstances of the present case estop the City from defending upon grounds of its own dereliction.

Moreover, even if the contract with plaintiff should be invalid upon a technicality (which is not held) and the City should not be estopped to claim the technicality (which is not held), nevertheless, the facts of this case raise an implied contract in terms identical with those of the informal contract under which the parties acted.

- 10 -

*Id.* at 642; *cf. Ailor*, 1996 WL 722041, at *3 (applying equitable estoppel where the plaintiffs "incurred substantial obligations . . . to finance the repairs to their home based on the representations made" by the city manager that the city would repay the plaintiff's costs). The general rule has been stated as follows: "'[W]here a municipal corporation receives the benefit of the performance of a contract, invalid merely for the failure to comply with some formality in its execution not affecting the power of the corporation in the matter, it is thereby estopped to assert the invalidity of the contract.'" *Trull*, 554 S.W.2d at 642 (quoting 56 AM. JUR. 2D *Municipal Corporations* § 527).

What proof was before the trial court on the issue of equitable estoppel in this case? In support of their motion for summary judgment, the plaintiffs submitted an amended statement of undisputed material facts, the affidavit of Nick Arnold,[6] the amended affidavit of George Greenwood, the amended affidavit of Janet Langley, and the affidavit of Don Fox.[7] The plaintiffs' affidavits contain statements relevant to the estoppel issues:

*Greenwood affidavit*

6. Sometime in 2010, I was instructed that meeting with the City Insurance Committee and the full Council was no longer necessary and that I should report directly to the Commissioner of Finance, who would then meet with the Council to make formal decisions. I operated in this capacity with the Commissioner of Finance from this point until my termination in February 2014.
7. In 2013, administerial changes were required pursuant to the Patient Protection and Affordability Care Act. . . .
8. Due to these changes an updated "agent of record" designation had to be obtained. . . . Mr. Lee later informed me that the council had approved the renewal of my contract and my appointment as "agent of record" was continued. The new agreement was signed on June 4, 2013.
9. Janet Langley and I negotiated and secured the annual coverage for the Defendant's employee group health benefits with United HealthCare

---

[6] In his affidavit, Mr. Arnold, an employee of UHC, attested to his knowledge of UHC's documents concerning medical premiums. Attached to his affidavit is a document reflecting the total medical premiums paid by the City to UHC from March to July 2014. This information allowed the trial court to calculate the amount of damages incurred by the plaintiffs.

[7] Mr. Fox, a former mayor of the City, stated in his affidavit that the City's commissioner of finance had the authority to enter into an agreement with Mr. Greenwood to designate him agent of record and that the City did not have to pass a separate ordinance to approve Mr. Greenwood's appointment as agent of record or service fee because these items were part of the budget. Because these are questions of law, we decline to rely upon Mr. Fox's affidavit.

Services, Inc. . . . for the July 1, 2013, through July 1, 2014, contract year, and a Billing and Collection Agreement was executed on June 4, 2013.

10. Under the Billing and Collection Agreement, the City would pay Ms. Langley and I a monthly service providers' fee totaling 3.5% of the monthly medical premiums. This service fee would be included in the amount UHS collected from the City for its monthly premiums. UHS was authorized to directly pay me 75% and Ms. Langley 25% of the service fee.

. . .

12. The employment contract further provided that the termination of the contract shall in no way impair the agent's rights to commissions for the remainder of the current contract year. It further specifies that the commissions on the business placed by the agent of record are considered earned as agent of record for the remainder of the current insurance contract period.

. . .

19. I have performed all conditions and promises required and in accordance with the terms and conditions of the contract, in negotiating and securing health insurance coverage for the City's employees.

. . .

24. Due to the City's termination of my status as broker/agent of record, I have suffered and continue to suffer economic damages.

The statements made by Ms. Langley in her affidavit are substantially the same as those made by Mr. Greenwood in his affidavit.

In response to the plaintiffs' motion, affidavits, and amended statement of undisputed material facts, the City submitted only arguments. The City relied upon the trial court's denial of the plaintiffs' previous motion for partial summary judgment (for which there is no order or other proof in the record). According to the City, its failure to respond to the plaintiffs' request for admissions and request for production of documents "was merely an oversight by counsel due to numerous professional and personal unforeseen events occurring." Arguing that the plaintiffs were relying upon the same facts and circumstances as in their motion for partial summary judgment, the City requested that the plaintiffs' motion for summary judgment be converted to a motion to compel and that it be given two weeks to respond to the plaintiffs' requests. The City further requested that the parties again be ordered to engage in discovery.

In the one-half-page section of its appellate brief on the issue of equitable estoppel, the City's only argument is that the agreement was executory, thereby precluding application of this equitable doctrine. We disagree. The City emphasizes the provisions of the broker/service provider agreement requiring the agent of record to "[a]ssist the Customer Account on an ongoing basis with employee benefits," and "[k]eep Customer Account updated with information on new employee benefits which the

Broker/Service Provider may become aware of." For the purposes of the current dispute, however, the issue is the plaintiffs' entitlement to their service fees, which the agreement expressly provides are "hereafter considered earned as Broker/Service Provider of Record." It is undisputed that the plaintiffs secured health coverage for the City's employee group health plan with UHC for the July 1, 2013 through July 1, 2014 contract year. The City agreed to pay for that coverage by having UHC collect 3.5% of the monthly premium amount from the City and pay this to the plaintiffs. Although the City terminated the plaintiffs as agents of record in early February 2014, UHC continued to provide health coverage for City employees through the July 1, 2014, as required under the contract negotiated by the plaintiffs. Thus, the City retained the benefit of the plaintiffs' services but refused to pay for those services through the end of the contract period.

The City also asserts, without any supporting authority, that the contract was executory because the City "was obligated to make monthly payments" and had not performed its obligation to make those payments. We again disagree. These types of equitable remedy cases often involve a claim by one party for payment for services provided to the other party. *See, e.g., Prof'l Eng'g,* 2000 WL 33281686, at *5 (where engineering firm provided services without valid contract, court found "it would be unjust for the City [to] benefit from the services provided by PES without providing compensation"); *Carter Cnty.,* 190 S.W.2d at 316 (where county received full benefits of improperly approved purchases, court found implied contract to pay for the benefits received). As the Supreme Court stated in *City of Lebanon v. Baird,* "[t]he classic case of estoppel . . . is the acceptance of the benefits of a contract and the subsequent refusal of a city to pay for the benefits received." *Baird,* 756 S.W.2d at 244 (citing *Trull,* 554 S.W.2d at 641-42).

Based upon the plaintiffs' motion and supporting documents and the defendants' response, as well as the undisputed facts and the applicable law, we conclude that the trial court did not err in applying the principles of equitable estoppel and granting the plaintiffs' motion for summary judgment.[8]

---

[8] We find the case of *Blue Cross-Blue Shield v. City of Lawrenceburg,* 1997 WL 195468 ("*BCBS*"), to be distinguishable from the present case. In *BCBS,* BCBS sought reimbursement for out-of-contract claims it paid for the City's employees. *BCBS,* 1997 WL 195468, at *1. The mayor and city treasurer signed an agreement with BCBS to reimburse the insurance company for such payments if the company was in a deficit position. *Id.* The court found the contract to be *ultra vires,* but also found that the city did not receive any tangible benefit from BCBS paying the employees' claims. *Id.* at *2-3. In the present case, the benefit to the City results from the plaintiffs' procurement of a health insurance plan for its employees, not from the insurance company's payment of certain claims.

CONCLUSION

The judgment of the trial court is affirmed.  Costs of appeal are assessed against the appellant, the City of Lebanon, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE